**Ted GEFFNER, Plaintiff,**

v.

**LINEAR ROTARY BEARINGS, INC. and Garnette S. Teass, Defendants.**

**No. 91–CV–1879 (JS).**

United States District Court,
E.D. New York.

Sept. 1, 1996.

Murray Schaffer, Panagiota Betty Tufariello, Bauer & Schaffer, Mineola, New York, for Plaintiff.

Christopher B. Fagan, Richard M. Klein, Fay, Sharpe, Beall, Fagan, Minnich & McKee, Cleveland, Ohio, William R. Hansen, Nims, Howes, Collison, Hansen & Lockert, New York City, for Defendants.

## OPINION AND ORDER

SEYBERT, District Judge:

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court adopts the Findings of Fact and Conclusions of Law set forth below. To the extent that any of the Findings of Fact may be construed to constitute a Conclusion of Law or any Conclusion of Law may be construed to constitute a Finding of Fact, the same is hereby adopted by the Court in accordance with the proper characterization.

### FINDINGS OF FACT

**A. Procedural Background**

1. Plaintiff Ted Geffner initiated this action on May 24, 1991 against defendants Linear Rotary Bearings, Inc. ("LRB") and Garnette S. Teass. In his Complaint, plaintiff charged the defendants with (1) infringement of claims 1–14 of Geffner's U.S. Patent No. 4,025,128 (the " '128 patent"), (2) breach of a license agreement dated August 3, 1977 between Geffner and LRB concerning the '128 patent, (3) palming off, and (4) unjust enrichment. *See* Compl. ¶¶ 1–27. Plaintiff sought recovery for unpaid royalties in the amount of $162,790 as of July 31, 1989, and royalties accrued subsequent to that date, the amount thereof to be determined through an accounting. *See* Pretrial Order, App. E.

2. Defendants answered plaintiff's Complaint on July 19, 1991 denying the allegations set forth in the Complaint and asserting the defenses of (1) invalidity of the '128 patent, (2) non-infringement of the '128 patent, (3) non-enforceability of the '128 patent due to fraud or inequitable conduct allegedly committed by Geffner on the United States Patent and Trademark Office (the "PTO") in obtaining the '128 patent, (4) estoppel, (5) laches, and (6) failure to state a claim upon

which relief can be granted. *See* Answer and Counterclaims ¶¶ 1–34.

3. Additionally, defendants counterclaimed seeking declaratory judgments of (A) invalidity or unenforceability of the '128 patent, (B) unenforceability of the licensing agreement between Geffner and LRB, and (C) that LRB was lawfully marketing bearings without violating the '128 patent and/or contract rights. Moreover, defendants sought return of royalty payments of approximately $477,032.00 previously paid by LRB to Geffner under the licensing agreement as a result of Geffner's alleged acts of fraudulently inducing LRB to enter into the license agreement. *See* Answer and Counterclaims ¶¶ 35–46; Pretrial Order, App. D.

4. In support of defendants' above indicated contentions, defendants attached as Exhibit A to the Answer and Counterclaims a letter from the defendants' prior attorneys to plaintiff dated November 29, 1989 concerning defendants' defenses and charges. As indicated in Attachment A, it is defendants' position that the claims of the '128 patent are anticipated and thus invalid under 35 U.S.C. § 102 in view of a prior published British Patent Specification No. 896,251 issued to Norman Manby (the "Manby patent"). Separately, defendants contend that the claims of the '128 patent are unenforceable in view of a number of fraudulent misrepresentations concerning the Manby patent that plaintiff made to the PTO. Further, as a result of plaintiff's failure to disclose material information concerning the foregoing to LRB in connection with its entry into the licensing agreement at issue, defendant LRB seeks a return of past royalties paid. *See* Attachment A to the Answer and Counterclaims, at 6.

5. Defendants have requested from the Court (1) dismissal of plaintiff's Complaint with prejudice, (2) attorney fees and costs for defending against Geffner's Complaint, (3) a declaratory judgment that LRB's manufacture, use and sale of its bearings is fully lawful and does not violate any patent or contract rights of plaintiff Geffner, (4) compensation for damages suffered by LRB as a result of Geffner's improper inducement of LRB to enter into the licensing agreement

for the '128 patent including the return of past royalties paid, (5) punitive damages as a result of Geffner's alleged acts of fraudulently obtaining the '128 patent and/or his fraudulent inducement of LRB to enter into the license agreement, (6) recovery of defendants' attorney fees and costs for the prosecution of the counterclaims, and (7) such other and further relief as this Court may deem just and proper. *See* Answer and Counterclaims, at 9–11.

6. The allegations set forth in defendants' Counterclaims were denied by plaintiff in his Answer to Counterclaims filed on August 8, 1991. *See* Pl.'s Answer to Defs.' Counterclaims ¶¶ 35–46.

7. A bench trial was held by this Court from September 28, 1995 through October 10, 1995. Upon the completion of plaintiff's case on the merits, defendants moved for dismissal of plaintiff's charges of infringement of claims 2, 4 and 6–8 of the '128 patent based upon an insufficient showing of evidence. In addition, defendants moved that codefendant Garnette S. Teass be dismissed from this action as a result of plaintiff's failure to present evidence establishing the involvement of Mrs. Teass in respect of any of the allegations set forth in the Complaint. Furthermore, defendants sought dismissal of plaintiff's allegations of palming off and unjust enrichment.

8. In response to defendants' motions, plaintiff conceded his failure to establish any evidence during the presentation of his case concerning (i) the alleged infringement of claims 2, 4 and 6–8 of the '128 patent, Tr. 557; and (ii) the involvement of Mrs. Teass in respect of the allegations raised in the Complaint. Tr. 550. Consequently, plaintiff withdrew these charges from this litigation.

9. With respect to defendants' request for dismissal of the palming off and unjust enrichment counts set forth in the Complaint, plaintiff continued to assert these allegations purportedly based upon defendant LRB's use of the '128 patent number on LRB's product literature. The Court requested briefing from the parties on this issue and such briefing was submitted by the defendants.

10. Plaintiff subsequently withdrew these claims, and at the same time moved, by letter motion dated October 27, 1995, to amend his pleadings to add the counterclaim defense of assignee estoppel. This application to add the new counterclaim defense was opposed by the defendants on the ground that it was unduly prejudicial because (i) defendants had no notice of this defense until it was first raised by plaintiff's counsel near the end of the bench trial; (ii) defendants had no opportunity to cross-examine plaintiff's witnesses with respect to this defense; and (iii) plaintiff's new defense was not addressed in any of the pleadings, in the Trial Briefs (or at least defendants' Trial Brief because plaintiff elected not to file one), and more importantly, in the Pretrial Order submitted jointly by the parties.

11. For the reasons stated in defendants' letter dated November 3, 1995, the Court agrees with the defendants' contentions that it would be unduly prejudicial to the defendants to allow plaintiff to amend his pleadings subsequent to trial to assert the counterclaim defense of assignee estoppel. Accordingly, plaintiff's motion to add this counterclaim defense is DENIED. *See* Fed.R.Civ.P. 15(b).

12. Accordingly, the outstanding issues in this case relate to (i) the validity or enforceability of the remaining claims of plaintiff's '128 patent (i.e., claims 1, 3, 5 and 9–14) in view of the Manby patent and Geffner's arguments and drawings submitted to the PTO in attempting to distinguish the teachings of Manby from the Geffner invention; and (ii) whether the license agreement between Geffner and LRB concerning the '128 patent is subject to rescission in light of Geffner's alleged breach of fiduciary duty in inducing LRB to enter into the agreement at issue.

13. As more particularly discussed below, this Court finds that the remaining claims of the '128 patent (i.e., claims 1, 3, 5 and 9–14) are invalid and unenforceable in view of the prior art disclosures of Manby and Geffner's inequitable conduct before the PTO during the prosecution of the '128 patent.

14. Further, this Court holds that the license agreement at issue is subject to re-scission as a result of Geffner's breach of his fiduciary duty of loyalty to LRB through his failure to disclose to LRB's other directors various critical issues relating to the possible invalidity or unenforceability of the '128 patent. Accordingly, the patent agreement at issue having been rescinded, defendant LRB is entitled to restitution of all royalties paid under the license agreement and the legal fees that it incurred on plaintiff's behalf for the prosecution and maintenance of plaintiff's foreign patents.

15. In addition, because the Court finds this to be an exceptional case, defendant LRB is entitled to reimbursement of its costs, attorney fees and expenses under 35 U.S.C. § 285.

## B. *Factual Background*

### 1. *Introduction*

16. Plaintiff Geffner is an engineer and has been engaged in the design, development and manufacturing of bearings for over forty years. Compl. ¶ 3. In this regard, Geffner has worked in bearing research as a chief research and development engineer for a variety of leading bearing manufacturers including Thomson Industries and The Barden Corporation. Tr. 19–20. Plaintiff is the inventor of a number of rotary bearings including those claimed in U.S. Patent No. 3,446,-540 (Defs.' Ex. B8), U.S. Patent No. 3,692,371 (Pl.'s Ex. 13) and U.S. Patent No. 3,751,121 (Defs.' Ex. B9). Tr. 22.

17. Subsequent to his employment with The Barden Corporation as a consultant in bearing design, plaintiff alleges that he developed a new bearing having both linear and rotary features. This bearing was designed by Geffner in 1975. Tr. 24–25. Geffner then retained an attorney by the name of Jerome Bauer, a patent attorney with whom he previously had worked, for the purposes of preparing and filing a patent application directed to his new linear rotary bearing. Tr. 25.

18. Bauer prepared a patent application directed to Geffner's linear rotary bearing and filed said application as Application Serial No. 631,035 at the PTO on November 12, 1975. Defs.' Ex. A1, at 2–24. This applica-

tion was entitled "Antifriction Bearings" and it later issued as the '128 patent, which is the subject of the present action.

19. After filing the "Antifriction Bearings" patent application, Geffner and Albert Adelmann formed Linear Rotary, Inc., the predecessor to defendant LRB. This company was formed in 1976 with Geffner becoming Vice President and receiving 24 shares and Adelmann becoming President and receiving 76 shares out of 200 total shares outstanding. Tr. 26–27. Later, William Mitschang became a shareholder of Linear Rotary, Inc., receiving 2 shares. Defs.' Ex. D9, at 3; Tr. 29, 34.

20. During the prosecution of the "Antifriction Bearings" application before the PTO, Geffner first became aware of the Manby patent, when it was brought to his attention by a group of Japanese businessmen. Tr. 106–08. Although Geffner discussed the existence of the Manby patent with the other members of the Board of Directors of Linear Rotary, Inc., the Court finds Geffner's discussions with the other board members concerning this matter to have been vague, and to have knowingly, and materially, understated Geffner's own substantial concerns that Manby anticipated (or disclosed) the features of his invention and presented a significant problem with respect to the validity and enforceability of his patent. Tr. 177–78.

21. After learning of the existence of Manby, plaintiff Geffner prepared some drawings and overlays (i.e., "Geffner graphics, A1–A2, B1–B2, C1–C4") which purportedly showed the distinguishing features of the Geffner bearing as compared to the linear rotary bearing disclosed in the Manby patent. Tr. 110–11. However, as more particularly reviewed below, these graphics and overlays were misleadingly drawn by Geffner in his attempt to distinguish the Geffner invention from the prior art.

22. Geffner's graphics were then utilized by Bauer in an interview with the Examiner at the PTO and later submitted by Bauer in a "Supplemental Amendment" filed at the PTO. The Supplemental Amendment discussed the subject of the interview and the distinguishing features of the Geffner invention relative to the features of the Manby linear rotary bearing. As a result of the Supplemental Amendment and the attached Geffner graphics, the Geffner application was allowed to issue as a patent by the PTO.

23. Furthermore, in addition to disclosing the existence of the Manby patent to the PTO, Bauer also made known the existence of the Manby patent to each of his foreign associates, providing the same with copies of the Geffner drawings and overlays. This occurred in November, 1976. At least two of his foreign associates, i.e., foreign associates in West Germany and the United Kingdom, responded quickly and indicated that the claims of the corresponding foreign Geffner applications were directly anticipated by Manby. In addition, the foreign associates brought to Bauer's attention a number of flaws in Geffner's arguments and drawings that he had presented to the PTO. However, notwithstanding this information, the contents of the foreign associates' positions concerning the Manby patent were never disclosed by Geffner to the other directors of Linear Rotary, Inc. Tr. 179.

24. Approximately six months later, on May 24, 1977, the '128 patent was issued to Geffner by the PTO. During the prosecution of the Geffner application, neither Geffner nor Bauer informed the PTO of any deficiencies in their previously submitted drawings and arguments.

25. On August 3, 1977, plaintiff Geffner licensed the '128 patent to Linear Rotary, Inc. At that time, Geffner was an officer, director and shareholder of Linear Rotary, Inc. The license agreement (the "Patent Agreement," Pl.'s Ex. 2) granted Linear Rotary, Inc. an exclusive license to make, use and sell bearings according to Geffner's '128 patent and required Linear Rotary, Inc. to pay Geffner a royalty. This royalty varied depending upon the amount of bearings sold. A ten percent royalty was payable on the first five million dollars of sales of all bearings manufactured and sold by Linear Rotary, Inc. embodying any of the features of the '128 patent. Thereafter, the royalty rate dropped to six percent. Pl.'s Ex. 2, at 3. In addition, minimum royalties, which were credited against royalties payable, were to be

paid as follows: first year—$0; second year—$25,000; third year—$50,000; fourth and following years—$75,000. Pl.'s Ex. 2, at 16.

26. The license agreement was for the full life of the '128 patent. In addition, a provision within the license agreement stated that Geffner did not represent or warrant the validity of the '128 patent or its foreign counterparts. Pl.'s Ex. 2, at 2–3.

27. Further, with respect to the royalty provision, according to the agreement, the minimum royalties were not to accrue until one year after the end of the month in which Linear Rotary, Inc. received an aggregate of $300,000.00 in consideration for its issued shares of capital stock. Pl.'s Ex. 2, at 6. Once the license agreement was in place and stock had been issued, Horace A. Teass, Sr., an attorney and a friend of Geffner, purchased stock for himself, his friends and his associates. Tr. 30–31. The corporate name of Linear Rotary, Inc. was then changed to Linear Rotary Bearings, Inc. in or about August of 1977. Defs.' Ex. D8, at 1.

28. Following the execution of the Patent Agreement, LRB began to manufacture and to sell linear rotary bearings embodying many of the features of the invention disclosed in the '128 patent. In 1977, the first commercial linear rotary bearings were sold. Pl.'s Ex. 14. In so doing, defendant LRB created catalogs and product literature and labelled its literature with the '128 patent number. Pl.'s Ex. 3A; Tr. 31–33. In addition, Geffner wrote several articles explaining how his linear rotary bearing operated. These articles were published in various trade magazines such as *Power Transmission Design*. Pl.'s Ex. 5A, 5B. Further, as sales progressed, LRB remitted royalty payments to Geffner in accordance with the Patent Agreement.

29. In 1980, Bauer and Geffner were informed that Geffner's corresponding West German patent application was being opposed by three German bearing manufacturers based upon the Manby reference. Bauer responded to the opposition with arguments similar to those he had made to the PTO.

30. In 1981, Geffner left the active service of LRB and retired to Florida. Geffner, however, continued to work with Bauer, his attorney, in the handling of patent matters concerning the '128 patent. Tr. 35. The prosecution fees for Geffner's corresponding foreign patent applications were paid by LRB. Tr. 292–93.

31. On February 22, 1983, the West German Patent Office rejected the Geffner application in view of the Manby patent.

32. In 1984, Horace A. Teass, Sr. purchased the 78 shares of LRB owned by Adelmann and the 2 shares owned by Mitschang. By so doing, Mr. Teass, Sr. became the majority shareholder, controller and President of LRB. Tr. 33–34; *see* Defs.' Ex. D9, at 3–4 (initial issuance of shares to Adelmann and Mitschang).

33. Pursuant to the Patent Agreement, beginning in 1982, a minimum royalty of $75,000 per year was payable to plaintiff Geffner. However, in 1986, LRB sustained financial difficulties and was unable to make full payment to Geffner. In this connection, LRB was unable to pay the balance of minimum royalties due as of June 30, 1986, amounting to $51,791. Pl.'s Ex. 7, last page. Further, LRB was unable to pay the balance of minimum royalties due for the period ended June 30, 1987, amounting to $48,537. *Id.*

34. Subsequently, in late 1987, Geffner learned that a Japanese bearing company, i.e., Nippon Bearing Co., Ltd. ("Nippon"), was selling in the United States a bearing similar to the linear rotary bearing of his '128 patent. Pursuant to the Patent Agreement which required LRB to prosecute infringers of the '128 patent, LRB brought this matter to Nippon's attention by letter. This matter eventually was settled for $6,363.22 with Nippon agreeing to discontinue selling such bearings in the United States. Pl.'s Ex. 12C.

35. LRB's financial difficulties continued into 1988–1989. As a result, LRB was unable to make full payment of the royalties due to Geffner. This resulted in annual deficiencies due Geffner in the amounts of $46,886 on June 30, 1988 and $48,901 on June 30, 1989. Pl.'s Ex. 7, last page.

36. In September, 1989, Horace A. Teass, Sr. passed away. Tr. 572. For an interim period of time, LRB was run by an assistant to Mr. Teass, i.e., Mr. Darryl Wakker, while the board decided how to proceed. Sales of LRB had fallen from almost $600,000 down to $300,000 and LRB for the last number of years was not profitable. Tr. 563–67.

37. Plaintiff Geffner terminated the Patent Agreement with LRB in October, 1989. Compl. ¶ 8. As of July 31, 1989, LRB owed Geffner $177,790 under the agreement. This amount was reduced to $162,790 as a result of another partial payment made by LRB of $15,000. Compl. ¶ 17. Furthermore, Geffner notified LRB to cease and desist from selling bearings embodying any of the features disclosed in his '128 patent.

38. Upon receipt of Geffner's default notice, LRB (under the direction of Mr. Wakker) sought patent counsel and was informed that the '128 patent was invalid in view of the Manby patent. Tr. 566. Further, LRB was informed by counsel that the '128 patent was unenforceable. This information was communicated to Geffner in late 1989 and LRB ceased making royalty payments. Tr. 42–43, 566.

39. In January, 1990, Garnette Teass (the daughter-in-law of Horace A. Teass, Sr., an attorney and a certified public accountant), was appointed President of LRB. Tr. 561. When Mrs. Teass first joined LRB, it was unclear whether the company was going to go out of business. Tr. 561–62.

40. On May 24, 1991, plaintiff Geffner initiated this action seeking recovery for past royalty payments under the Patent Agreement and additional damages for LRB's alleged acts of infringement. Based on the alleged invalidity of the '128 patent and the alleged unenforceability of the Patent Agreement, LRB counterclaimed seeking recovery of all past royalties paid. Furthermore, following the institution of the lawsuit, defendant LRB deleted all references to the '128 patent number from LRB's product literature.

41. As of the date of trial, LRB has two full-time employees and three part-time employees including Mrs. Teass. Annual sales for the fiscal year ending March 31, 1995 were approximately $430,000. Tr. 563. There are approximately 26 shareholders, including Geffner who owns approximately 12% of LRB. The company has never paid a dividend and only recently has become profitable. Tr. 567–68.

42. In the final analysis, LRB paid Geffner $477,032 in royalties. Pretrial Order, App. F., at 15 (stipulated fact). In addition, LRB paid $50,499 in legal fees on plaintiff's behalf for the prosecution and maintenance of plaintiff's foreign patents. Pretrial Order, App. D., at 12; Tr. 569–70. The sum of these two figures ($527,531) therefore represents the amount by which the plaintiff has profited as a result of his entry into the Patent Agreement with LRB.

### 2. The '128 Patent

43. As mentioned above, plaintiff Geffner filed an application for a patent with the PTO on November 12, 1975 for his alleged invention entitled "Antifriction Bearings." Defs.' Ex. A1, paper 1. This patent application eventually issued as the '128 patent, the patent presently in dispute. Pl.'s Ex. 1.

44. Figure A, below, shows a disassembled antifriction bearing of the '128 patent, comprising four major components: an outer race 14 (Defs.' Specimen Ex. E25), a retaining means 26 containing small bearing balls (Defs.' Specimen Ex. E26), and closure rings 48, 50.[1]

---

1. The reference numbers correspond to the numbers used in the applicable patent. The drawings contained within this Opinion and Order are not intended to be drawn to scale, but rather are provided for illustrative purposes only to show the spacial relationships between the material elements of the inventions.

Fig. A

45. Figure B (Defs.' Ex. E7), below, shows a cross-sectional view of the cylindrically-shaped outer race 14. Running lengthwise along the inner surface of the outer race 14 are a plurality of raised, bearing lands 20, each of which extends longitudinally a distance slightly shorter than the length of the outer race. (See also Figure A above.) The raised, bearing lands 20 are separated by elongated recesses 22 (channels) which also extend longitudinally along the inner surface of the outer race. The linear, raised bearing lands 20 and recesses 22 are positioned at specific intervals around the interior surface of the outer race. Because the bearing lands 20 and recesses 22 are formed on the inner periphery of the circular race number 14, they are arcuate in width or in cross sections.

Fig. B

46. Figure C, below, shows the cylindrically-shaped retaining means 26.[2] Running lengthwise along, and cut through the wall of the retaining means, are a plurality of elongated, oval closed loop paths 27, each path retaining a number of small bearing balls 24, and facilitating the directed travel thereof. Pl.'s Ex. 1 (Col. 3, lines 5–18 of the '128 patent).

2. Figures A, B and C are not found in the '128 patent and were provided to the Court by the defendants in their Trial Brief as an aid in understanding the '128 patent. No corresponding Trial Brief was submitted by plaintiff Geffner. The remaining Figures are reproduced from the applicable patent.

## Fig. C

47. Each closed loop path 27 of retaining means 26 has a pair of parallel, spaced-apart tracks 28a and 28b connected at their ends by semi-circular returns 30, similar in shape to a safety pin. The closed loop paths of the retaining means are spaced apart from each other at specific intervals around the retaining means.

48. In this regard, Figures 4 and 5, below, reproduced from the '128 patent, show one closed loop path 27 of the retaining means 26. The closed loop paths of the retaining means are cut through the wall of the retaining means (i.e., open through the wall of the retaining means), such that the bearing balls 24 (absent from Figures 4 and 5) retained and travelling within the closed loop paths project slightly outside of both the interior and exterior surfaces of the retaining means. Pl.'s Ex. 1 (Col. 3, lines 19–34 of the '128 patent).

## Fig. 4

## Fig. 5

49. Because each retainer segment 26 co-operates to form parts of a whole retainer ring positioned between the inner and outer race members, their longitudinally extending sides 38 are angled radially toward the center or axis of the bearing. Similarly, the inside walls of each of the legs or pathways 28, identified as 42, cooperate with oppositely facing surfaces 44. The surfaces 44 define a double taper terminating in a central groove 46 that tends to position and seat the ball bearing elements 24 properly in their pathways. The two tapered sides of the surfaces 44 cooperating with the single taper of the surface 42 provide for a triangular position-ing or three-point support of the ball bearing element 24 in each of the pathways 28 as is seen more clearly in Figure 3 of the '128 patent. Pl.'s Ex. 1 (Col. 3, lines 25–52 of the '128 patent).

50. Considering the above description and assuming that the retainer means 26, whether formed of a complete circle of sepa-rate arcuate sections 26 as illustrated in Fig-ures 4 and 5 or as a single ring retainer means as described above, the plurality of closed loop paths 27 each will have the two substantially parallel longitudinally-extend-ing pathway legs 28a and 28b. The longitu-

dinally-extending center lines of the ball bearing elements 24 extending along the length of the legs 28a and 28b will be spaced from each other in each respective closed loop path 27 an arcuate distance that is greater than the arcuate width of each of the bearing lands 20. Pl.'s Ex. 1 (Col. 5, lines 34–36 of the '128 patent).

51. Stated another way, the arcuate width of the bearing lands 20 will be smaller than the space between the center lines of the pathway legs 28a and 28b of each respective closed loop path 27 so that the rollable bearing elements 24 in each of the pathway legs 28a and 28b of their one respective closed loop path 27 cannot be simultaneously engaged between the inner and outer race members.

52. According to the teachings of the '128 patent, at no given time during the operation of the bearing is it possible for the rollable bearing elements 24 in one of the pathway legs 28a or 28b to be engaged with a bearing land 20 at the same time as the rollable bearing elements 24 of the other spaced pathway leg of the same closed loop path. As a consequence, the bearing elements 24 of one of the pathway legs 28a or 28b of each closed loop path must be out of engagement with a bearing land 20 in the event that the bearing elements 24 of the other corresponding pathway leg of the same closed loop path is in bearing engagement with a land 20. Pl.'s Ex. 1 (Col. 5, lines 27–56 of the '128 patent).

53. According to the '128 patent, the arrangement of the pathway legs of each closed loop path described above is necessary. If the rollable bearing elements in the two pathway legs 28a and 28b of the *same* closed loop path 27 were simultaneously engaged with one or more bearing lands 20, the bearing elements and lands would be locked against relative rectilinear motion and there could be no free flow of the elements 24 within their respective closed loop path.

This would lock up the inner and outer race members and prevent their relative motions and the operation of the antifriction bearings. By providing that the arcuate width of the lands 20 is smaller than the spacings of the center lines of the pathway legs 28a and 28b of the *same* closed loop path 27, it is assertedly impossible for the bearing elements in both pathway legs 28a and 28b of one closed loop path to be simultaneously engaged between the inner and outer race members. Pl.'s Ex. 1 (Col. 5, lines 57–68 through Col. 6, lines 1–4 of the '128 patent).

54. When the components of the antifriction bearings of the '128 patent are assembled, the retaining means 26, with bearing balls 24 retained within its closed loop paths 27, is positioned inside the outer race element 14 and is held therein by two closure rings 48 and 50 which are affixed respectively at each end of the outer race. (See Figure A above.) Although the retaining means 26 is held within the outer race element 14, it is not stationary therein. The retaining means is designed to rotate within the outer race, or the outer race can revolve around the retaining means.

55. Figures 1 and 2, below, reproduced from the '128 patent, show side views of an assembled antifriction bearing with a solid shaft 12 inserted therethrough as the inner race. (A physical specimen of the bearing of Figure 1 of the '128 patent is represented by Defs.' Ex. E24.) In Figure 2, a portion of the outer race 14 is removed to show the bearing balls 24 in one track (i.e., 28a or 28b) of one closed loop path 27 of the retainer means 26. Because the small bearing balls 24 of the retaining means 26 project slightly outside of both the interior and exterior surfaces of the retaining means 26, the bearing balls 24 can come into contact with the solid shaft 12, or the inner surface of the outer race 14, or both.[3] The antifriction bearing can move linearly along the shaft, and can rotate around the shaft. The linear and rotary movements between the antifriction bearing and the shaft can occur separately or simultaneously.

---

**3.** Figure 2 shows bearing balls 24 in one track (i.e., 28a or 28b) engaging both a bearing land 20 of the outer race and the shaft 12.

Fig. 1

Fig. 2

FIG.2

---

56. Movement of the antifriction bearing of the '128 patent is allowed as a result of a continuous circulation of the bearing balls around each closed loop pathway, and through the rotation of the bearing balls within the closed loop pathway. The lands and recesses of the outer race, and the closed loop paths of the retainer means are precisely positioned so that bearing balls travelling along one track of a closed loop path engage both the outer surface of the shaft and one of the bearing lands of the outer race (i.e., Figure 2), while bearing balls travelling along the adjacent track of the same closed loop path travel through a recess of the outer race.

57. Bearing balls in a single retainer means are positioned so that the balls of one track of the retainer engage a land while the balls of the adjacent track are in a recess. As a result, the bearing balls can move freely around the closed loop path, much like horses on a race track. Tr. 95.

58. Because the retaining means and the outer race are designed to rotate within or around each other, the movement of the

bearing balls within the closed loop paths may be both rotary and linear. During rotary movement of the retaining means, the bearing balls within the closed loop paths are travelling across the bearing lands and recesses located along the inner surface of the outer race. One may think, then, that at some point in the rotational movement, the tracks of a closed loop path might not align with a recess and a land of the outer race. However, the relative widths between the parallel tracks of each closed loop path, the spacing between each closed loop path, the widths of the raised, bearing lands, and the widths of the recesses therebetween are designed to prevent such an occurrence. This occurrence is known as "jamming" or "bearing lock-up."

59. As briefly described, jamming or lock-up occurs when the bearing balls in *both* tracks of the *same* closed loop path align with and engage simultaneously bearing lands. When this occurs, one track of the *same* closed loop path is no longer aligned with a recess of the outer race and thus, the bearing balls cannot circulate through the closed loop path. According to Geffner, he was the first to recognize this relationship. Tr. 81–82.

60. The essence, or allegedly novel feature of Geffner's invention relates to the relative widths between tracks (i.e., 28a or 28b) of each closed loop path 27, the widths of the bearing lands 20, and the widths of the recesses 22. These relative widths are designed to prevent jamming which, again, is the situation in which all ball bearings in both tracks of the *same* closed loop path simultaneously engage a bearing land or lands.

61. In this regard, Figure 3 below, reproduced from the '128 patent, shows an end view of the bearing and shaft with a portion of the bearing removed. To prevent jamming, the '128 patent requires that the width (C) of each recess 22 be made greater than the distance (A) between tracks (28a or 28b) of the same closed loop path 27, and the width (B) of the bearing lands 20 be made smaller than the distance (A) between tracks (28a or 28b) of the same closed loop path 27.[4] As a result, the relationship $C > A > B$ is required in order to prevent jamming or lock-up. Tr. 90, 98–102. In addition, the '128 patent further prevents jamming by making the number of the closed loop paths unequal to the number of bearing lands. Tr. 100–03.

**Fig. 3**

4. In the Supplemental Amendment filed with the PTO, dated October 19, 1976, Geffner's prosecuting attorney, Jerome Bauer, used the letter C to designate the width of the recesses, the letter A to designate the distance between pathways of the closed loop path, and the letter B to designate the width of the bearing lands. The remaining portions of this Opinion use these designations to facilitate an understanding of the '128 patent and the *Manby* patent.

### 3. *The Prior Art—The Manby Patent*

62. The Manby patent (Defs.' Ex. B6) entitled "Improvements in or relating to Anti–Friction Bearings" is substantially identical to the '128 patent. The Manby patent specification was published on May 16, 1962 (approximately 13 years before the filing of the Geffner application), based upon a British patent application (Serial No. 7072/57) filed on March 4, 1957. Defs.' Ex. B6.

63. The Manby patent specification (or "Manby"), like the Geffner '128 patent, discloses a number of constructions of an anti-friction bearing which permits both relative linear and relative turning movement between the bearing assembly and a shaft. Defs.' Ex. B6 (page 1, lines 10–16 of the Manby patent). In this regard, Manby discloses at least two related embodiments found in Figures 1–4 and Figures 5–6. The Court first will describe those features common to both embodiments, and then will turn to discuss the distinctions indigenous to each.

64. With reference to Figures 3 and 5 of Manby, each embodiment includes a hollow cylindrically-shaped bearing cage (items 12 and 26 respectively) positioned inside the outer race and rotatable therein. Each cage contains a plurality of ball bearings. The bearing cage facilitates the linear and rotary motion of the outer race with respect to the inner race.

65. The bearing cage (or retainer) includes a plurality of trackways (items 14 and 27 respectively) which contain the ball bearings. See below. The cage 12 has a thickness which is less than the ball bearing diameter. Each trackway is opened at the radial top and bottom so that the ball bearings may extend simultaneously from the outer and inner surfaces of the cage. As is the case with the '128 patent, linear movement of the ball bearings through the trackways facilitates linear movement of the outer race with respect to the inner race.

Fig. 3

FIG. 3

Fig. 5

66. With reference to the embodiments shown in Figures 1 and 6 below, the outer race (items 11 and 30 respectively) are generally cylindrically-shaped and contain an inner and outer surface. Located on the inner surface are a plurality of bearing lands (items 16 and 29 respectively) (described as "bearing faces" in Manby) which extend longitudinally a length which is less than the length of the outer race. A plurality of recesses (items 17 and 31 respectively) (described as "depressions" in Manby) are positioned between the bearing lands and extend longitudinally along the inner surface of the outer race. Like the bearing lands ("bearing faces"), the longitudinal length of the recesses ("depressions") is less than the length of the outer race. Positioned at the ends of the bearing lands and recesses are first and second circular recesses (called "peripheral depressions" in Manby).

Fig. 1 Fig. 6

FIG. 1

---

67. As stated above, linear movement of the outer race is provided by a continuous movement of the ball bearings through the trackways. Ball bearings in one trackway simultaneously engage both the bearing land ("bearing face") of the outer surface and the smooth surface of the inner race (called a "shaft") and move together in one direction. Concurrently, ball bearings in an adjacent trackway travel in the opposite direction and through a recess ("depression"). While in the recess, the ball bearings engage only one of the inner and outer races.

68. In the first embodiment as shown in Figures 1 and 3 of Manby, the trackways 14 are equally spaced apart around the bearing axis (Manby, page 5, lines 98–100) and are connected at their ends by semicircular-shaped returns 15 ("curved track end portions") to form a single closed zig-zag circuit around the periphery of the cage. (See the bearing cage of Figure 3 above.) In this arrangement, the interconnections between the trackways allow for a continuous stream of ball bearings to circulate completely around the cage periphery. The returns are aligned with the first and second circular recesses ("peripheral depressions" in Manby). Thus, when the ball bearings enter any one of the returns, the ball bearings engage only one of the race members.

69. As previously stated, continuous movement of ball bearings through the trackways facilitates linear movement of the race member. The returns allow ball bearings in one trackway to move into an adjacent trackway. Since ball bearings in one trackway travel in an opposite direction of ball bearings in an adjacent trackway, the returns allow for a continuous stream of ball bearings through any one trackway.

70. The relative widths of the bearing lands (B) (i.e., "bearing faces"), the recesses (C) (i.e., "depressions") and the adjacent trackways (A) are described. On page 2 beginning at line 102, Manby sets forth:

> The circumferential width of the bearing faces 16 is made slightly less than the width of the depressions 17 so that as measured peripherally the distance between the contact points of balls 13 in adjacent trackways is very slightly greater than the width of each bearing surface 16.

Defs.' Ex. B6 (page 2, lines 102–108 of Manby patent).

71. In other words, the arcuate width of each recess (C) is greater than the arcuate width of each bearing land (B), and the width between adjacent trackways (A) is greater than the arcuate width of the bearing lands (B). Using the Geffner scheme, C > B and A > B.

72. Further, the number of longitudinal trackways in the cage of the embodiment of Figures 1–4 is twice the number of longitudinal bearing faces (bearing lands) on the outer race. Moreover, the trackways and bearing faces are spaced equally apart around the bearing axis. Defs.' Ex. B6 (page 5, lines 94–100 of the Manby patent). This is to

prevent jamming or the formation of a "critical setting," the situation in which ball bearings in adjacent pathways simultaneously engage both the inner race and the bearing land. *Id.* (page 2, lines 123–130 and page 3, lines 1–28 of Manby patent).

73. As mentioned above, an alternative form of construction which illustrates "a further method of avoiding critical settings" is shown in Figures 5–6 and discussed in principle on page 3, lines 69–110 of the Manby patent. Here, adjacent pairs of trackways are connected by returns to form a plurality of closed loop tracks (or "circuits"), as is the case in the '128 patent. (See Figure 5 of Manby above.) In one trackway, ball bearings travel in one direction simultaneously engaging both the bearing land (or "bearing face") and the inner race. Ball bearings in the other trackway travel in the opposite direction and through a recess ("depression") of the outer race.

74. In this regard, Manby indicates that the modified retainer or bearing cage 26 of Figure 5 is the same as the retainer or bearing cage 12 of Figures 1 and 3 with the exception that, instead of joining the ends of the trackways together to form a single closed zig-zag arrangement, the trackways are joined at each end to form a plurality of closed circuits. Specifically, Manby on page 3, lines 72–86 states:

> Fig. 5 shows a modified bearing cage 26 having trackways 27 *corresponding to the trackways 14 except for the fact* that they are connected in adjacent pairs with those of each pair joined at both ends by arcuate track end portions 28. Thus the cage provides a succession of separate closed circuits for the balls arranged around the circumference of the cage. *As before* the balls in each closed circuit run along trackways 27 for linear motion and while in one of the trackways they engage a bearing surface 29 on an outer race 30, see Fig. 6, and run freely in the other trackways opposite a depression 31 in the race.

Defs.' Ex. B6 (page 3, lines 72–86 of Manby patent) (emphasis added).

75. This embodiment is described as permitting linear and rotary motion of the outer race member in the same manner as the bearing of the first embodiment, but with a set of balls running around a separate closed loop track (or "circuit") as opposed to a zigzag succession of interconnected trackways. In other words, the bearing cage of the second embodiment is identical to that of the first embodiment except for the manner in which the pathways are interconnected by the returns.

76. The recesses ("depressions") are further described as having a width slightly greater than the width of the closed loop track (C > A). In particular, beginning on page 3, line 86, Manby recites:

> The depressions 31 are each of a width slightly greater than the distance between the contact points of balls in adjacent trackways.

Defs.' Ex. B6 (page 3, lines 86–89 of Manby patent).

77. The embodiment of Figures 5–6 contains a further variation of the embodiment of Figures 1–4. This variation relates to the relative number of closed loop tracks and bearing lands. In particular, and beginning on line 93 of page 3, Manby recites that:

> In the example shown in Figures 5 and 6 there are ten trackways 27 forming five complete circuits but instead of there being five bearing surfaces on the race 30 as in the construction of Fig. 1 there are six such surfaces thereby avoiding the theoretical possibility of a critical setting since it is ensured that whatever the relative rotary positions of the cage 26 and race 30 there are at least three rows of balls 13 spaced apart around the bearing axis to take the load by engaging with a bearing surface 29.

Defs.' Ex. B6 (page 3, lines 93–105 of Manby patent).

78. Thus, Manby also teaches the avoidance of jamming (or a "critical setting") by, among other things, employing an unequal number of closed loop tracks and bearing lands.

79. As a result, the embodiment of the Manby invention shown in Figures 5–6 is the same as the bearing claimed in Geffner's '128 patent. Specifically, Manby shows a cylin-

drically-shaped retainer means ("bearing cage") 26 coaxially positioned between the outer race 30 and the shaft 10. As is the case with the '128 patent, the retainer means 26 can turn relative to shaft and outer race about their common axis. Defs.' Ex. B6 (page 2, lines 76–78 of Manby patent). The retainer means ("bearing cage") includes a plurality of closed loop paths (or "closed circuits"), each of which is filled with ball bearings 13. *Id.* page 3, lines 72–80.

80. Continuous movement of the ball bearings 13 around the closed loop paths or circuits provides for linear movement of the outer race 30 over the shaft 10. During linear movement, ball bearings 13, circulating through one elongated track of the closed loop circuit, simultaneously engage both the bearing land 29 and the shaft 10, while ball bearings 13 circulating through the other track of the same closed loop path or circuit, travel through the recess 31. *Id.* page 3, lines 80–86. While in the recess ("depression") 31, the ball bearings 13 engage either the outer race 30 or shaft 10, but not both.

81. Further, Manby explicitly recognizes the possibility of jamming, i.e., ball bearings 13 in both tracks of the same closed loop path simultaneously engaging separate bearing lands 29. To prevent jamming (or the occurrence of a "critical setting"), Manby teaches the identical, allegedly novel features of the '128 patent: that the recess width (C) should be greater than the distance (A) between tracks of the closed loop path (*id.* page 3, lines 86–89), and that the bearing surface width (B) should be less than the width (A) between tracks of the closed loop path (*id.* page 2, lines 105–118). Moreover, Manby teaches that the number of closed loop paths should be unequal to the number of bearing lands 29. *Id.* page 3, lines 93–100.

### 4. *Manby Discloses All of the Limitations of the Remaining Claims of Geffner's '128 Patent*

82. A review of the remaining claims of the '128 patent indicates that all of the elements or limitations specified therein are present in Manby. Tr. 665–81. As an aid in clarifying this issue, set forth below are (1) a table showing Manby elements which are

identical to the elements of claim 1 of the '128 patent, and (2) a Claim Chart Analysis for claims 1, 3, 5, and 9–14 of the '128 patent with respect to the Manby patent. Defs.' Ex. D26 (Defs.' Expert Report).

| Elements of claim 1 of Geffner's '128 Patent | Manby Elements |
|---|---|
| 1. First race member | Outer bearing race 11, 30 |
| 2. Second race member | Shaft 10 |
| 3. Bearing lands | Bearing faces or surfaces 16, 29 |
| 4. Rollable bearing elements | Bearing balls 13 |
| 5. Retainer means | Bearing cage 12, 26 |
| 6. Closed loop path | Circuits formed by trackways 27 and end portions 28 |
| 7. Recesses | Depressions 17, 31 |
| 8. Pathways | Trackways 27 |
| 9. Returns | End Portions 28 |
| 10. Circular Recess | Depression 24 |

| The '128 Patent | Manby |
|---|---|
| 1. In a rectilinear and rotary motion bearing having relatively spaced first and second race members, | 1. Manby relates to a rectilinear and rotary motion bearing having relatively spaced first (outer bearing race 11, 30) and second (shaft 10) race members. See p. 1, lines 10–26. |
| one of said members having relatively spaced bearing lands, | One of said members (outer bearing race 11, 30) has relatively spaced bearing lands (bearing surfaces 16, 29). See p. 2, lines 54–57. |
| rollable bearing elements in said bearing for movement between said first and second race members and movable into and out of engagement with said bearing lands, | Rollable bearing elements (bearing balls 13) in said bearing move between said first (outer bearing race 11, 30) and second (shaft 10) race members and movable into and out of engagement with said bearing lands (bearing surfaces 16, 29). See p. 2, lines 6–23, p. 3, lines 80–86. |
| retainer means between and movable relative to said first and second race members and having a plurality of closed loop paths for retaining said bearing elements between said first and second race members, the invention comprising | Retainer means (bearing cage 12, 26) is between and movable relative to said first (outer bearing race 11, 30) and second (shaft 10) race members and has a plurality of closed loop paths (trackways 27 and end portions 28) for retaining said bearing elements (bearing balls 13) between said first (outer bearing race 11, 30) and second (shaft 10) race members. See p. 2, lines 44–46 and 76–78, p. 3, lines 73–77. |
| said closed loop paths each having a pathway defined therein | Said closed loop paths (trackways 27 and end portions 28) |

| The '128 Patent | Manby |
| --- | --- |
| through which the bearing elements project for rectilinear and rotary rolling engagement with said first and second race members, | each have a pathway (trackway 27) defined therein through which the bearing elements (bearing balls 13) project for rectilinear and rotary rolling engagement with said first (outer bearing race 11, 30) and second (shaft 10) race members. See p. 2, lines 63–66, p. 3, lines 6–9, 72–77, and 80–84. |
| said bearing lands being relatively spaced by recesses defined in said one member, | Said bearing lands (bearing surfaces 16, 29) are relatively spaced by recesses (depressions 17, 31) defined in said one member (outer bearing race 11, 30). See p. 2, lines 54–57. |
| and said lands and closed loop paths being unequal in number with said closed loop paths extending continuously for substantially the full effective length of said bearing lands, | Said lands (bearing surfaces 16, 29) and closed loop paths (trackways 27 and end portions 28) are unequal in number with said closed loop path (trackways 27 and end portions 28) extending continuously for substantially the full effective length of said bearing lands (bearing surfaces 16, 29). See p. 3, lines 93–100, p. 2, lines 91–95, p. 3, lines 13–23 and FIGS. 2 and 4. |
| each said closed loop path having two of said pathways each of which is relatively spaced from the other an extent greater than the extent of each of said bearing lands and less than each of said recesses. | Each said closed loop (trackways 27 and end portions 28) path have two of said pathways (trackways 27) each of which is relatively spaced from the other an extent greater than the extent of each of said bearing lands (bearing surfaces 16, 29) and less than each of said recesses (depressions 17, 31). See p. 2, lines 105–108 and p. 3, 86–89. |
| 3. A bearing as in claim 1, | 3. |
| said retainer means being circular and coaxially arranged between said first and second race members for free rotation relative to said lands and recesses of said one race member and movable rectilinearly relative to the other of said race members. | Said retainer means (bearing cage 12, 26) is circular and coaxially arranged between said first (outer bearing race 11, 30) and second (shaft 10) race members for free rotation relative to said lands (bearing surfaces 16, 29) and recesses (depressions 17, 31) of said one race member (outer bearing race 11, 30) and movable rectilinearly relative to the other of said race members (shaft 10). See p. 2, lines 76–77, lines 109–112, 119–123 and FIGS. 1, 2, and 6. |
| 5. A bearing as in claim 3, | 5. |
| returns at the opposite ends of each of said closed loop paths connecting together said pathways of their closed loop paths, | Returns (end portions 28) at the opposite ends of each of said closed loop paths (trackways 27 and end portions 28) connect together said pathways (trackways 27) of their closed loop paths (trackways 27 and end portions 28). See p. 3, lines 73–77. |
| one of said coaxial race members having a circular recess at the opposite returns of said closed loop paths to enable the unobstructed movement of the bear- | One of said coaxial race members (outer bearing race, 11, 30) has a circular recess (depression 24) at the opposite returns of said closed loop |

| The '128 Patent | Manby |
| --- | --- |
| ing elements about said returns between said race members. | paths (trackways 27 and end portions 28) to enable the unobstructed movement of the bearing elements (bearing balls 13) about said returns (end portions 28) between said race members (outer bearing race 11, 30 and shaft 10). See p. 2, lines 89–95, p. 3, lines 13–22, lines 72–77 and FIGS 2 and 4. |
| 9. In a bearing as in claim 1, | 9. |
| and the relative space between adjacent pathways of adjacent closed loop paths being greater than the arcuate extent of said bearing lands. | The relative space between adjacent pathways (trackways 27) of adjacent closed loop paths (trackways 27 and end portions 28) are greater than the arcuate extent of said bearing lands (bearing cage 12, 26). See p. 2, lines 105–108 and FIG. 6. |
| 10. In a bearing having inner and outer circular race members coaxially arranged for relative arcuate and rectilinear movement, | 10. The Manby patent shows an anti-friction bearing having inner (shaft 10) and outer (outer bearing race 11, 30) circular race members coaxially arranged for relative arcuate and rectilinear movement. See p. 1, lines 10–26, FIGS. 1, 2 and 6. |
| one of said members having alternating bearing lands and recesses defined therein, | One of said members (outer bearing race, 11, 30) has alternating bearing lands (bearing surfaces 16, 29) and recesses (depressions 17, 31) defined therein. See p. 2, lines 54–57. |
| rollable bearing elements between said race members, | Rollable bearing elements (bearing balls 13) are between said race members (outer bearing race 11, 30 and shaft 10). See p. 3, lines 6–9, and FIGS 1, 2 and 6. |
| means retaining certain of said bearing elements coaxially between said race members and for movement each in a respective one of a plurality of closed loop paths in which each of said paths is relatively spaced from the other, | Means (bearing cage 12, 26) retaining certain of said bearing elements (bearing balls 13) coaxially between said race members (outer bearing race 11, 30 and shaft 10) for movement in a respective one of a plurality of closed loop paths (trackways 27 and end portions 28) in which each of said paths (trackways 27) is relatively spaced from the other. See p. 3, lines 13–23, lines 72–86 and FIGS. 1, 2, 5 and 6. |
| each said closed loop path having at least two relatively spaced pathways through which the bearing elements therein project for bearing engagement between said race members, | Each said closed loop path (trackways 27 and end portions 28) have at least two relatively spaced pathways (trackways 27) through which the bearing elements (bearing balls 13) therein project for bearing engagement between said race members (outer bearing race 11, 30 and shaft 10). See p. 2, lines 63–66, p. 3, lines 6–9, and FIGS 1 and 6. |
| and said closed loop paths and lands being unequal in number with the relative space between the center line of each pathway of their respective closed loop path being greater than the extent of each said bearing land and less than each of said recesses. | Said closed loop paths (trackways 27 and end portions 28) and lands (bearing surfaces 16, 29) are unequal in number with the relative space between the center line of each pathway (trackways 27) of their respective closed loop path (trackways 27 and end |

| The '128 Patent | Manby |
|---|---|
| | portions 28) being greater than the extent of each said bearing land (bearing surfaces 16, 29) and less than each of said recesses (depression 8, 31). See p. 3, lines 93–98, p. 2, lines 102–108, and p. 3, lines 86–89. |
| 11. In a bearing as in claim 10, | 11. |
| said closed loop paths extending for substantially the full effective bearing lengths of said bearing lands, | Said closed loop paths (trackways 27 and end portions 28) extend for substantially the full effective bearing lengths of said bearing lands (bearing surfaces 16, 29). See p. 2, lines 91–95, p. 3, 13–23, and FIGS 2 and 4. |
| and said pathways of each of said respective closed loop paths being connected by a return at one of the ends of the paths through which said bearing elements may project for engagement with but one of said race members. | Said pathways (trackways 27) of each of said respective closed loop paths (trackways 27 and end portions 28) are connected by a return (end portions 28) at one of the ends of the paths (trackways 27) through which said bearing elements (bearing balls 13) may project for engagement with but one of said race members (outer bearing race 11, 30). See p. 3, lines 13–22, 72–77 and FIGS 2, 3 and 5. |
| 12. In a bearing having inner and outer race members coaxially arranged for relative rectilinear and rotatable movement, | 12. Manby describes an anti-friction bearing having inner (outer bearing race 11, 30) and outer (shaft 10) race members coaxially arranged for relative rectilinear and rotatable movement. See p. 1, lines 10–26. |
| rollable bearing elements between said members for bearing engagement therewith, | Rollable bearing elements (bearing balls 13) are between said members (outer bearing race 11, 30 and shaft 10) for bearing engagement therewith. See p. 3, lines 6–9, lines 80–84 and FIGS. 1 and 6. |
| means retaining said bearing elements for movement in a plurality of respective closed loop paths coaxially between said members and for rectilinear and rotary movement relative thereto, | Means (bearing cage 12, 26) retain said bearing elements (bearing balls 13) for movement in a plurality of respective closed loop paths (trackways 27 and end portions 28) coaxially between said members (outer bearing race 11, 30 and shaft 10) and for rectilinear and rotary movement relative thereto. See p. 3, 6–13, lines 72–86, and FIGS 1 and 6. |
| bearing lands and non-bearing recesses alternately defined on one of said race members for bearing and non-bearing engagement respectively with said bearing elements, | Bearing lands (bearing surfaces 16, 29) and non-bearing recesses (depressions 17, 31) are alternately defined on one of said race members (outer bearing race 11, 30) for bearing and non-bearing engagement respectively with said bearing elements (bearing balls 13). See p. 2, lines 54–57 and lines 128 to p. 3, line 14. |
| each said respective closed loop path having a pathway through which the bearing elements in said respective closed loop path project for engagement with said race members, | Each said respective closed loop (trackways 27 and end portions 28) path have a pathway through which the bearing elements (bearing balls 13) in said respective closed |
| | loop path (trackways 27 and end portions 28) project for engagement with said race members (outer bearing race 11, 30 and shaft 10). See p. 2, lines 63–66, p. 3, lines 6–9 and FIGS 1 and 6. |
| said pathway of one closed loop path being spaced an extent from the pathway of the next adjacent closed loop path different than the arcuate extent of each of said bearing lands, | Said pathway (trackways 27) of one closed loop path (trackways 27 and end portions 28) are spaced an extent from the pathway (trackways 27) of the next adjacent closed loop path (trackways 27 and end portions 28) different than the arcuate extent of each of said bearing lands (bearing surfaces 16, 29). See p. 2, lines 105–108. |
| and said closed loop paths and bearing lands being unequal in number. | Said closed loop paths (trackways 27 and end portions 28) and bearing lands (bearing surfaces 16, 29) are unequal in number. See p. 3, lines 93–98. |
| 13. In a bearing as in claim 12, | 13. |
| said retainer means being rotatively movable between said race members, and rectilinearly relative to one of said race members, | Said retainer means (bearing cage 12, 26) is rotatively movable between said race members (outer bearing race 11, 30 and shaft 10) and rectilinearly relative to one of said race members. See p. 2, lines 76–78 and lines 121–123. |
| and said closed loop paths each extending continuously and uninterruptedly for substantially the full effective bearing lengths of said bearing lands. | Said closed loop paths (trackways 17 and end portions 28) each extend continuously and uninterruptedly for substantially the full effective bearing lengths of said bearing lands. See p. 2, lines 91–95, p. 3, lines 13–23 and Figs. 2 and 4. |
| 14. In a bearing as in claim 13, | 14. |
| each said closed loop path having two said pathways connected by a return pathway whereby the center lines of said two pathways of a respective one of each of said closed loop paths are relatively spaced from each other an extent greater than that of each of said bearing lands. | Each said closed loop path (trackways 27 and end portions 28) has two said pathways connected by a return pathway (depressions 17, 31) whereby the center lines of said two pathways (trackways 27) of a respective one of each of said closed loop paths (trackways 27 and end portions 28) are relatively spaced from each other an extent greater than that of each of said bearing lands. See p. 2, lines 105–108 and p. 3, lines 72–77. |

83. As indicated in the Claims Chart shown above, the Court finds that each of the noted Geffner claims "reads" on one or more of the bearings disclosed in Manby.

84. In this regard, even plaintiff's expert, Mr. Muller, acknowledged common subject matter between the patents, testifying that while Geffner taught "an elegant solution" to a problem, Manby taught "a lesser solution" to the same problem. Tr. 445, 523.

85. Plaintiff Geffner contends that, because one or more novel features are present

in the '128 patent, his patent can be distinguished from Manby. Thus, according to the plaintiff, his bearing is not anticipated by Manby.

86. According to Geffner's expert, Mr. Muller, this result is attributable to the fact that the Geffner bearing has further distinguishing design characteristics over the Manby bearing including the use of unequal spacing between adjacent closed loop paths. Tr. 384–86. Because Manby discloses equal distribution of all of the ball paths while the '128 patent indicates that the distance between ball paths of adjacent closed loops may vary, Muller is of the view that the '128 patent is directed to a greater number of design features than Manby. Tr. 385–86.

87. Similarly, using an analogy based upon a car to illustrate the alleged differences in bearing design characteristics, Muller surmised that a hypothetical "Manby car" only would be able to turn to the left, while a hypothetical "Geffner car" would be able to turn both to the left and to the right. Tr. 410, 450. Using this analogy, plaintiff's expert concluded that the Geffner patented bearing is substantially different from the Manby design.

88. However, while Geffner may relate to further distinguishing features relative to Manby, (i.e., unequal spacing between balls of different closed loop paths) *these distinguishing features are not stated in the language specified by the Geffner claims.* Thus, these purported distinguishing features have no consequence on the anticipation issue in this lawsuit. Tr. 705–07.

89. Thus, Manby discloses and reads on (i.e., directly anticipates) all of the limitations stated in the remaining claims of the '128 patent. Thus, claims 1, 3, 5 and 9–14 lack novelty and are anticipated by Manby. Tr. 681.

90. Notwithstanding the above findings, it is the Court's understanding that the last paragraph of claim 1 contains two additional limitations which Geffner contends to be distinguishable from Manby. Tr. 192. The last paragraph of claim 1 of the '128 patent recites:

each said closed loop path having two of said pathways, each of which is relatively spaced from the other an extent greater than the extent of each of said bearing lands and less than each of said recesses.

Pl.'s Ex. 1 (col. 7, lines 42–46 of '128 patent). However, it is the Court's opinion that these limitations are present in Manby. This is described in more detail below.

91. The first alleged distinguishable limitation requires the pathways of each closed loop path to be relatively spaced from each other an extent greater than the width of the bearing lands.

92. On page 2, lines 105–108, Manby discloses:

the distance between the contact points of balls 13 in adjacent trackways is very slightly greater than the width of each bearing surface 16.

Defs.' Ex. B6 (page 2, lines 105–108 of Manby patent).

93. In the Court's opinion, the phrase "distance between the contact points of balls 13 in adjacent trackways" in Manby is the same in meaning as the language referring to the spacing between two pathways of a closed loop path, as recited in claim 1 of the '128 patent. Because Manby discloses that the distance between contact points of balls 13 in adjacent trackways is "greater" than the width of each bearing surface 16, it follows that Manby reads on the limitation of claim 1 that the spacing between pathways of each closed loop path is greater than the extent of the bearing lands.

94. Plaintiff Geffner further argues that because the specification of the '128 patent measures the distance between the two pathways of each closed loop based upon the distance between the "center lines" of the ball bearings in each pathway, while Manby measures the distance between the two pathways (trackways) based upon "contact points" of the ball bearings, Manby does not disclose the pathway distance limitation of the remaining claims of the '128 patent. Tr. 218–19; *see also* Tr. 852 (testimony of Bauer). According to plaintiff Geffner and his expert, Gerald Muller, this is so because the distance between the "contact points" of

the ball bearings in Manby included not only the distance between the center lines of the ball bearings but also smaller distances (i.e., thousandths of an inch) relating to the distance between the inside edges of adjoining trackways or bearing balls. Tr. 145–46, 364–66, Defs.' Ex. E6. According to plaintiff, this distinction arises because different locations on the surface of the ball bearing could come into contact with the outer race. Tr. 364–69.

95. However, it appears that Geffner's definition of the distance between "contact points" discloses the distance between the center lines of the ball bearings by necessary implication. Tr. 792. Indeed, Geffner implies this in his illustrations. *See* Defs.' Ex. C17 (last two pages), C18 (last two pages).

96. Further, when Mr. Bauer attempted to construe the dimension "A" (the distance between the pathway legs of each closed loop path) to be the inner tangent points of the balls in graphics A1 and A2, such an "A" failed to exceed the widths of the lands ("B") required by the claims (i.e., "C > A > B"). Tr. 904–07. Therefore, Mr. Bauer's second definition of "A" based upon contact points fails to conform to his original definition of "A" based on center lines utilized in the Supplemental Amendment and drawings.

97. Accordingly, in view of the above noted shortfalls and others, this Court fails to find any support for plaintiff Geffner's contentions that Manby does not disclose the distance limitations specified in the remaining claims of the '128 patent.

98. The second alleged substantial distinction that Geffner alleges concerns the requirement that the pathways of the closed loop paths be relatively spaced from each other a distance that is less than the width of the recesses.

99. On page 3, lines 86–89, Manby teaches:

The depressions 31 are each of a width slightly greater than the distance between the contact points of balls in adjacent trackways.

Defs.' Ex. B6 (page 3, lines 86–89 of Manby patent).

100. Because the distance between contact points of balls in adjacent trackways is substantially the same as the spacing between pathways of each closed loop path, the Court is of the view that Manby discloses the claim 1 limitation that pathways are spaced from each other a distance that is *less* than each of the recesses.

101. Similarly, plaintiff Geffner attempts to differentiate the last paragraph of claim 1 from Manby by indicating that the distance-between-pathways limitation does not have to be limited to the pathways of the same closed loop path but also could include the distance between pathways of two adjacent closed loops. However, not only do the last paragraphs of claim 1 read contrary to such an interpretation, the graphics submitted by Geffner (i.e., see the discussion below concerning the Supplemental Amendment) purportedly to represent the Geffner invention (i.e., Geffner drawings A1, A2) indicate the opposite, even upon allowing for the fact that they were not intended to be drawn to scale, but were designed for illustrative purposes only.

102. Moreover, Geffner denied that Manby taught the specific C > A > B relationship set forth in the last paragraph of claim 1 of the '128 patent. Similarly, Geffner denied that Manby taught a workable bearing. However, even Geffner's expert, Mr. Muller, admits that Manby discloses the C > A > B relationship in his calculations.

103. Specifically, in his calculations, Mr. Muller calculated in his model that the width of the recesses is 1.02 ("D" or "depression"), the distance between the trackways or contact points of the bearings is 1.0 ("B" or "bearing") and the width of the bearing lands is 0.65 ("L" or "lands"). Since 1.02 > 1.0 > 0.65 (or D > B > L), even Mr. Muller calculated that the Manby bearing meets the C > A > B parameter of the claims. Pl.'s Ex. 23–24.

104. Similarly, Muller concluded that such a Manby 1.02 > 1.0 > 0.65 design would work and function properly. Additional working embodiments meeting the C > A > B parameter also were specified by Muller in his calculations. Pl.'s Ex. 26.

105. Consequently, plaintiff's own expert determined that Manby discloses the limita-

tions of the remaining claims of the '128 patent. Tr. 452–53.

106. Further, even Geffner testified that Manby teaches a workable bearing, but allegedly only on paper. Tr. 260–62. In this regard, Geffner contends that the Manby patent does not disclose his invention because Manby never built a workable bearing. However, in the Court's view, to the extent that the Manby patent does not explicitly disclose all of the limitations of the '128 patent, any remaining limitations of the '128 patent are inherently disclosed by Manby. In this regard, the defendants have proven by clear and convincing evidence that persons of ordinary skill in the field of the invention would recognize the limitation of center lines from the Manby prior art reference. Indeed, the Court is of the view that, if a person of ordinary skill in the field of the invention were asked to determine the contact points of the ball bearings, such person would respond that this answer easily could be obtained by drawing lines down the center of the pathway legs (i.e., by drawing "center lines"). Accordingly, under principles of inherency, the Court does not regard the Geffner limitation of center lines—or any other element of the '128 patent for that matter— to be novel. Thus, because the defendants have proven by clear and convincing evidence that the Manby patent discloses all of the limitations of the '128 patent's claims, this Court finds that all of the subject claims of the '128 patent read on the Manby reference.

### 5. The Prosecution of the Geffner '128 Patent in View of Manby [5]

107. During the initial prosecution of the Geffner application, the PTO Examiner allowed various claims concerning Geffner's antifriction bearings. Tr. 681–82. However, before the patent issued, Geffner learned of the Manby patent. Tr. 106–07. As discussed above, the Manby patent discloses an antifriction bearing remarkably similar in all important aspects to Geffner's invention.

108. Geffner's patent attorney, Jerome Bauer, held an interview with the PTO Examiner on October 8, 1976 to discuss the relevance of the Manby patent to the Geffner invention. During the course of the interview, the Manby patent was, for the first time, disclosed to the Examiner.

109. In discussing the relevance of the Manby patent with the Examiner, Mr. Bauer utilized a number of transparent overlay exhibits. Tr. 690–91. The overlays were presented to the PTO Examiner as representative, cross-sectional drawings of the Manby patent. However, as more particularly discussed below, the diagrams prepared by Geffner distorted and grossly misrepresented the features of the Manby bearing. Tr. 709–18.

110. Because Bauer was relying on the information provided to him by Geffner, Bauer did not recognize the misleading nature of the information submitted to him at the time of the interview. Tr. 808–09. However, as discussed below, it is clear that Geffner knew of these discrepancies.

111. In this regard, the interview was followed by a paper filed with the PTO entitled "Supplemental Amendment" (Defs.' Ex. A1, paper 7, at 37–65) in which Bauer discussed the contents of the interview and provided extensive arguments as to why Geffner's invention was substantially different from the Manby patent. The Supplemental Amendment, dated October 19, 1976, included not only copies of the transparent overlay exhibits utilized during the previous interview, but also a number of inaccurate statements such as the assertion that Manby *did not* avoid "critical setting" (i.e., a lock-up of the ball bearing structure), and that "[f]or the first time in *all* art relating to antifriction bearings, the [Geffner] application now teaches how to avoid such critical settings without the use of offset trackways and offset bearing surfaces...." Defs.' Ex. A1, paper 7, page 43, lines 1–12 (emphasis added). A more detailed discussion concerning the mis-

---

**5.** For completeness of record, the Court notes that its findings concerning inequitable conduct, and its determination that defendants have established inequitable conduct by clear and convinc-

ing evidence, would not be altered even if the center lines limitation of the '128 patent did not read on the prior Manby reference.

leading information set forth in the Supplemental Amendment is set forth below.

112. As a direct result of the distorted Geffner drawings and misleading information submitted by Bauer concerning Manby, which supposedly distinguished the Manby bearing from the Geffner bearing, the Geffner patent was allowed by the PTO.

113. Moreover, in addition to filing in the United States, Geffner filed patent applications for the same invention in numerous foreign countries, including England (United Kingdom) and West Germany.[6] In two separate letters dated November 4, 1976, Geffner, acting through Bauer, disclosed the Manby patent to each of his foreign attorneys. These letters also contained the same arguments used by Geffner before the PTO to distinguish his claimed invention from Manby. Defs.' Ex. B12, B18.

114. Geffner's British and German patent attorneys rejected his arguments that certain of the material spacial relationships expressed in his invention were distinguishable from Manby. In a letter to Mr. Bauer, dated November 10, 1976, A.A. Thornton & Co., Geffner's British patent attorneys, concluded that claim 1, the most crucial claim of Geffner's British application, was *anticipated* (i.e., identically disclosed) by Manby. Defs.' Ex. A18.

115. Similarly, in a letter dated November 25, 1976, Geffner's German patent attorneys, Boehmert & Boehmert, also concluded that the C > A > B "formula" in claim 1 of his German patent application was anticipated by the Manby patent. Defs.' Ex. B19. These letters from his foreign attorneys thus placed Geffner on notice with respect to the corresponding distortions in the information that he previously submitted to the PTO. Tr. 808–09.

116. On May 24, 1977, the PTO issued Geffner's '128 patent. This patent issued as a direct consequence of the knowingly and materially misleading drawings submitted by Geffner to the PTO Examiner in his attempt to distinguish the Geffner antifriction bearing from the Manby antifriction bearing.

117. Geffner did not submit any further information to the PTO Examiner either prior to the issuance of the '128 patent or thereafter to correct the misrepresentations that he made, despite the availability of numerous procedures at the PTO for correcting these deficiencies.[7] Tr. 772–73.

a) *Geffner's Acts of Deception Before the PTO—The Transparent Overlays*

118. As mentioned above, the Supplemental Amendment filed by Geffner included transparent overlays depicting what were represented to be cross-sectional diagrams of his invention and Manby. In submitting the transparent overlays to the PTO, Geffner's purpose was twofold. First, Geffner submitted the overlays to emphasize the purported distinguishing features between his invention and Manby. Second, Geffner demonstrated the transparent overlays before the Examiner to explain the essential operation of his bearing as well as Manby's. Geffner intended the Manby overlays to be placed one over the other, with a pin through their centers to allow the Examiner to rotate one relative to the other. By so doing, it was Geffner's intention that the Examiner would conclude that it would be possible for bearing balls in two trackways of the same closed loop path of Manby to engage a bearing surface or surfaces simultaneously, *thereby causing jamming*, and consequently distinguishing Geffner's invention. Tr. 121. Geffner's overlays depicting Manby were submitted as illustrative thereof. Defs.' Ex. A1, paper 7, at 46, lines 16–17; Tr. 122.

6. The Court takes judicial notice that the laws of patentability and examination practices may vary from country to country. Accordingly, the Court's discussion of the correspondences between Bauer and his foreign associates is addressed solely in the context as it pertains to Geffner's receipt of notice, and related knowledge, of the critical spacial relationships present in both the Manby patent and his own invention.

7. Subsequent to the issuance of the '128 patent to Geffner, the German Patent Office denied Geffner's patent application in view of Manby. *See* Defs.' Ex. D6.

The British Patent Office, in contrast, allowed Geffner's patent application to issue. The evidence before the Court is inconclusive as to whether Geffner cited the Manby patent to the British Patent Office.

119. However, it is apparent that the Geffner overlays were improperly drawn and materially misrepresented the teachings of Manby. Tr. 701–03. If the Geffner overlays representing Manby were drawn in accordance with the spacial relationships expressed therein, no jamming would have occurred when the Examiner rotated one relative to the other.

120. In this regard, attention is directed to Geffner's overlay designated C1 (Defs.' Ex. A1, at 62), reproduced below, which was represented to the Examiner as an accurate portrayal of Manby's five-track system. Defs.' Ex. A1, paper 7, at 46, lines 18–20.

Fig. C1

Manby Fig. 6

121. Geffner's overlay, C1, shows ball bearings that are *not equally spaced*. The Geffner overlay C1 clearly conflicts with Figure 6 of Manby, also reproduced above, which shows the ball bearings 13 of Manby's five-track system to be relatively equally spaced. Tr. 701–05.

122. In this regard, even plaintiff's own expert, Mr. Muller, conceded that Manby indicates that the balls are equally spaced. Tr. 472. Although Mr. Muller initially proffers in his Expert Report his opinion that Manby does not explicitly state the distance parameters between the balls, he nevertheless concludes that Manby intended that the balls be equally spaced. Defs.' Ex. E5 (M3), at 2 (letter from Mr. Muller to Mr. Schaffer dated September 8, 1995).

123. In an attempt to justify his C1 drawing, Geffner testified that Manby doesn't indicate that the balls are to be equally spaced and that C1 was drawn to show the extreme or worst condition (i.e., that jamming could occur in Manby) for the Examiner. Tr. 126,

142, 221–22 (testimony of Geffner), 832–34 (testimony of Bauer).

124. However, Manby on page 5, lines 99–100, in referring to the zig-zag successions (and not the close loop trackway), also states that the *trackways (and hence ball bearings) are spaced equally apart around the bearing axis*. Defs.' Ex. B6 (page 5, lines 99–100 of Manby patent). Although this section of Manby relates generally to the embodiment of the bearing shown in Figures 1–4, it is apparent that this teaching also applies to the embodiment shown in Figures 5–6, which uses closed loop trackways. This conclusion obtains because the bearing cages of the two embodiments are the same except for the manner in which the adjacent trackways are interconnected (i.e., zig-zag succession versus individual closed circuits). Indeed, even Mr. Geffner concurred with this relationship. Tr. 137–38, 232.

125. Further evidence that overlay C1 misrepresented Manby is provided by Geffner's own attorney, Mr. Bauer. Bauer ad-

mitted that overlay C1 incorrectly portrays Manby when, in a letter dated May 20, 1985 to Geffner, he stated that the overlays:

> would seem to be [in] error because the loops are shown to be of unequal spacing with respect to the relative space between adjacent paths of adjacent closed loops. Manby does not teach us anything other than by his illustration that the *paths of each closed loop and that the adjacent paths of adjacent closed loops are equally spaced from each other.*

Defs.' Ex. D5, at 3 (emphasis added). At trial, Mr. Bauer testified that he no longer agreed with this statement, but provided no persuasive explanation for his change in position. Tr. 861–62.

126. A comparison of overlays designated C1 and C3, reproduced below, illustrates a further misrepresentation of Manby to the PTO Examiner. In overlay C1, Geffner improperly portrayed Manby's distance (A) between contact points of balls in the same closed loop track (e.g., balls designated by the same number (1,1), (2,2), etc. are in the same closed loop) as being considerably wide. Overlay C3 incorrectly shows recess widths (C) which are considerably narrow. Tr. 703–04.

Fig. C1

Fig. C3

127. Superimposing overlay C1 with overlay C3 (Defs.' Ex. E10) shows the distance (A) between contact points of balls in the same closed loop track as being greater than the width of the recesses (C), in direct contradiction of the unambiguous teaching of Manby which explicitly requires that the width of the recesses (C) be *greater* than the distance (A) between the contact points of balls in the same closed loop path. Defs.' Ex. B6 (page 3, lines 86–89 of Manby patent); Tr. 704. Geffner testified that he studied Manby in preparing his overlays, but nevertheless managed to draw his overlays C1 and C3 in direct contradiction of the express teachings of Manby.

Figs. C1 & C3

128. Still another material misrepresentation is present in Geffner's overlay designated C3. Manby expressly requires the width (B) of the bearing faces to be less than the width (C) of the recesses. Defs.' Ex. B6 (page 2, lines 102–104 of Manby patent). However, Geffner's overlay C3 incorrectly shows the opposite; its width (B) of the bearing faces is greater than the width (C) of the recesses. Geffner represented before the PTO that his overlay C3 "discloses six races or bearing surfaces as suggested for the embodiment of Figs. 5 and 6 in [Manby] and as disclosed in column 2, page 3 of such patent." Defs.' Ex. A1, paper 7, at 47, lines 12–15. Geffner's overlay C3, however, inaccurately described Manby.

129. Figure 6 of Manby, reproduced below, does not show recess widths [C] substantially smaller than bearing surface widths [B] as portrayed by Geffner in overlay C3. Figure 6 of Manby shows that the recess width [C] is slightly greater than the bearing surface width [B]. Nothing in column 2, page 3 of Manby discloses or suggests making recess widths [C] smaller than widths [B].

Fig. C3

Fig. 6 Manby

130. Consequently, it is the Court's opinion that Geffner's inaccurate depictions of Manby could not have been made innocently in view of the fact that overlays C1 and C3 differed in material respects from the express teachings of the Manby patent specification and the relationships shown in Figure 6 of Manby. This conclusion moreover obtains in view of the totality of the circumstances, because Geffner (1) is a licensed, professional engineer, (2) has served as chief research and development engineer for a major United States bearing manufacturer, (3) is skilled in the art of bearings, (4) is the inventor of numerous previously-patented bearing devices, and (5) undertook a thorough examination of the Manby patent to present his learned, professional comparison of his invention to the PTO. Tr. 716.

131. Had Geffner submitted overlays made in accordance with the express and inherent teachings of Manby such as C1 Proper and C3 Proper, or had he provided a warning concerning the aggressiveness of his position in representing Manby, the Examiner likely would have noticed, under the circumstances, that Manby anticipates the claims of the Geffner application. Moreover, overlays properly drawn by Geffner would not have exhibited jamming to the Examiner when one was superimposed and rotated relative to the other. Tr. 710.

132. Geffner repeatedly stated to the Examiner that his overlays accurately reflected Manby. In fact, Geffner's overlays constitute a skewed comparison of Manby and the Geffner bearings, a comparison so implausible that this Court is unable to accept the explanation that plaintiff Geffner, one skilled in the art of bearings, a well-educated and experienced engineer, and an inventor of numerous previously-patented devices, simply colored outside of the lines when drawing his pictures. A far more plausible explanation to this Court is that Geffner submitted overlays precisely in a manner calculated to mislead the Examiner concerning the significance of the teachings of Manby. Geffner's misrepresentation of Manby thus amounts to a deliberate attempt to deceive the PTO in granting his patent application. Tr. 716–17.

### b) *Geffner's Acts of Deception Before the PTO—The Arguments in the Supplemental Amendment*

133. Geffner's Supplemental Amendment contained extensive arguments asserting that his claimed invention was patentably distinguishable from Manby. Geffner argued that he was the first and only person to invent an antifriction bearing which avoids jamming by arranging the relative widths of the bearing lands, recesses and tracks. In view of Manby, it is clear to this Court that Geffner's arguments in this regard were knowingly false.

134. In addition, the Court notes a number of inaccurate statements in specific portions of Geffner's Supplemental Amendment. Beginning, for example, from the last paragraph of page 7, Geffner points out the novel spacial relationships of his invention:

> each closed loop path [having] two pathways or legs, each of which is relatively spaced from the other an extent [A] that is greater than the extent of each of the bearing lands [B]. In addition, the two pathway legs of each respective closed loop path are spaced from each other a distance [A] less than the distance between such lands [B] or the extent of each of the recesses that space the lands from each other [C].

Defs.' Ex. A1, paper 7, at 43–44 (letter clarification added).

135. Geffner further noted that without his novel spacial relationships, one could not make a functional bearing having unequal numbers of bearing surfaces and closed loop tracks, "without drawing upon the precise teaching made by applicant." Defs.' Ex. A1, paper 7, at 45. This statement also is inaccurate. One can make an unjamming bearing having an unequal number of bearing surfaces and closed loop tracks without "Geffner's teaching" simply by looking to the teachings explicitly found in Manby. In particular, Manby states that in his bearing which has an unequal number of bearing lands and closed loop tracks:

> [t]he depressions 31 are each of a width [C] slightly greater than the distance be-

tween the contact points of balls in adjacent trackways [A]....

and,

the distance between the contact points of balls 13 in adjacent trackways [A] is very slightly greater than the width of each bearing surface 16[B].

Defs.' Ex. B6, page 3, lines 86–89, and page 2, lines 105–109, respectively (letter clarification added). Manby, in fact, explicitly teaches the formula which Geffner contends to have been novel (i.e., $C > A$ and $A > B$).

136. Geffner's misrepresentations of his invention and Manby do not relate to minor features. Rather, the misrepresentations relate to the material heart or essence of his invention and indeed may have been decisive to the grant of his patent. Without the misrepresentations, Geffner could point to no other patentable features to distinguish his claims from Manby.

137. Geffner's misstatements to the PTO directly contradicted the express and unambiguous teachings of Manby. Considering Geffner's extensive background in bearings, it is difficult to believe that his misstatements were a product of innocent oversight. Geffner, a licensed professional engineer, and a chief research and development engineer at a major U.S. bearing manufacturer, purports to have analyzed Manby in detail, but managed only to disclose the immaterial features while turning a blind eye to sections of Manby which anticipated his invention. Tr. 716–17. The conclusion reached by this Court is that Geffner intentionally misrepresented highly material features of Manby to the PTO in order to obtain the '128 patent.

### 6. Geffner's Acts of Self Dealing—The License Agreement with LRB [8]

138. On August 3, 1977, Geffner, at that time an officer, director, and shareholder of LRB, entered into the disputed license agreement for the '128 patent with LRB (the "Patent Agreement"). Pl.'s Ex. 2. LRB's Board of Directors, including Geffner, unanimously agreed to the Patent Agreement. Defs.' Ex. D8. While the other directors were told, in general terms, of the existence of the Manby patent, they were not informed of the specific concerns that Manby raised, of which Geffner was aware and fully appreciated. Among other things, Geffner did not inform the other directors of the aggressive position that he took in his presentation of Manby to the PTO in seeking to distinguish it from his own patent application. In addition, Geffner did not disclose Manby's significance to the other board members in a manner that was reasonably calculated to apprise them of the substantial concerns that Geffner himself possessed concerning the '128 patent's validity.

139. In addition, *before* entering into the Patent Agreement, Geffner was informed by his German and British attorneys that certain critical spacial relationships expressed in his patent also were present in the Manby patent.

140. The Patent Agreement was a major asset of LRB. In this regard, upon the fulfillment of certain conditions, it ultimately required LRB to pay Geffner royalties of at least $75,000 per year and a percentage of sales in return for an exclusive license to the '128 patent. Pl.'s Ex. 2. Geffner knew, however, both during the negotiation process and at the time that the Patent Agreement was executed, that the subject patent had been obtained as a result of his knowingly deceptive conduct before the PTO concerning matters for which he understood that a reasonable patent examiner would find important in deciding whether to allow his patent to issue.

141. The foregoing undisclosed facts were sufficiently important so that, if they were fully disclosed to the other directors, LRB would not have entered into the Patent Agreement.

142. As a director, Geffner was a fiduciary to LRB, and therefore was imbued with a special relationship of trust that required him to act with the utmost candor, good faith and loyalty in connection with his entry into the Patent Agreement. Geffner materially failed to comport his conduct to this standard.

8. For completeness of record, the Court notes that its findings of fact and conclusions of law in respect of Geffner's breach of fiduciary duty would not be altered even if the center lines limitation of the '128 patent did not read on the prior Manby reference.

143. LRB relied on Geffner, as a director and officer of LRB, to be prudent and honest in disclosing all material considerations relevant to its determination whether to enter into the Patent Agreement, and the appropriate amount of royalties to be paid based upon the value of the '128 patent.

144. In sum, LRB has shown by clear and convincing evidence that *all* of the independent claims of the '128 patent, the very essence of Geffner's invention, and the remaining supporting, · dependent claims of the '128 patent, were anticipated by the Manby patent. Moreover, LRB has shown by clear and convincing evidence that the '128 patent is unenforceable because Geffner, in his zeal to obtain his patent, intentionally misrepresented Manby to the PTO, and there is a substantial likelihood that a reasonable examiner would have considered the misleading depictions of Manby important in deciding whether to allow Geffner's application to issue as a patent. Further, LRB has shown that Geffner improperly induced LRB to enter into the Patent Agreement as a result of his failure to disclose material information concerning the subject patent, and that LRB reasonably relied to its detriment upon Geffner's material misrepresentations.

### CONCLUSIONS OF LAW

#### I. Jurisdiction and Venue

This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this is a civil action asserting claims of patent infringement brought under Title 35 of the United States Code. In addition, because the amount in controversy exceeds $50,000 and this action is between citizens of different states, this Court has jurisdiction under 28 U.S.C. § 1332. Venue is proper in this judicial district under 28 U.S.C. § 1400(b)

because the defendants reside in and operate their regular place of business within the Eastern District of New York. In this regard, defendant LRB is a corporation organized and existing under the laws of the State of New York.

#### II. Plaintiff's Motion to Amend Pleadings to Assert Counterclaim Defense of Assignee Estoppel

As previously discussed, plaintiff Geffner, by letter motion dated October 27, 1995, moved to amend his pleadings to add the counterclaim defense of assignee estoppel pursuant to Rule 15(b) of the Federal Rules of Civil Procedure. This application to add the new counterclaim defense was opposed by the defendants on the ground that it was unduly prejudicial because (i) defendants had no notice of this defense until it was first raised by plaintiff's counsel near the end of the bench trial; (ii) defendants had no opportunity to cross-examine plaintiff's witnesses with respect to this defense; and (iii) plaintiff's new defense was not addressed in any of the pleadings, in the Trial Briefs (or at least defendants' Trial Brief because plaintiff elected not to file one), and more importantly, in the Pretrial Order submitted jointly by the parties. For the reasons previously stated, this motion must be denied as it would be unduly prejudicial to the defendants, in view of the totality of the circumstances presented, to allow plaintiff to amend his pleadings subsequent to trial to assert the counterclaim defense of assignee estoppel.[9] *See supra* Findings of Fact ¶¶ 10–11; *Rio Rancho Estates, Inc. v. Beyerlein*, 662 F.2d 700, 705 (10th Cir.1981); *Save Lake Washington v. Frank*, 641 F.2d 1330, 1340 (9th Cir.1981); *McKee–Berger–Mansueto, Inc. v. Board of Educ.*, 626 F.2d 559, 563 (7th Cir.1980);

---

9. As an independent basis for its determination denying plaintiff's motion to assert the counterclaim defense of assignee estoppel, the Court expressly holds that, assuming *arguendo* the viability of this defense as a legal proposition, such defense is unavailable in light of the Court's factual findings herein. More specifically, the Court has determined that the alleged assignment of the patent in question was procured as a result of Geffner's breach of his fiduciary duty of loyalty to LRB by engaging in an act of self dealing without disclosing material facts. Accordingly, the balance of the equities tips decidedly against the application of estoppel. *See*

*Roberts v. Sears, Roebuck and Co.*, 573 F.2d 976, 982 (7th Cir.) (appropriate to balance the equities in determining whether to apply doctrine of estoppel in connection with the assignment of a patent), *cert. denied,* 439 U.S. 860, 99 S.Ct. 179 (1978); *Baladevon, Inc. v. Abbott Laboratories, Inc.*, 871 F.Supp. 89, 95, 33 U.S.P.Q.2d 1743, 1748 (D.Mass.1994) ("Whether estoppel should be applied in a particular case, the Federal Circuit has suggested, should be determined by balancing the equities.") (citing *Diamond Scientific Co. v. Ambico, Inc.*, 848 F.2d 1220, 1224–25 (Fed.Cir.), *cert. dismissed,* 487 U.S. 1265, 109 S.Ct. 28, 101 L.Ed.2d 978 (1988)).

*American Hot Rod Ass'n v. Carrier*, 500 F.2d 1269, 1275–76 (4th Cir.1974).

### III. The Asserted Invalidity of the Geffner '128 Patent as Anticipated by the Prior Art

■ "Under 35 U.S.C. § 282, a patent is presumed valid, and an attack on its validity requires proof of facts by 'clear and convincing evidence....'" *Buildex Inc. v. Kason Indus.*, 849 F.2d 1461, 1463 (Fed.Cir.1988) (quoting *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984)); *see Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1050 (Fed.Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988); *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1570 (Fed.Cir.1986); *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1372 (Fed.Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed.Cir. 1983). This presumption of validity applies not only to the patent as a whole, but also to "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form)...." *Stratoflex*, 713 F.2d at 1534. Thus, "dependent or multiple dependent claims shall be presumed valid even though [dependent] upon an invalid claim." *Id.*

Defendants contend that all of the claims in question of the Geffner '128 patent are anticipated by the prior Manby patent and thereby rendered invalid under 35 U.S.C. § 102(a) and (b). Under these provisions, a patent will be invalid where the invention

> was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or ...
>
> was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.
> ...

35 U.S.C. § 102(a), (b).

■ "A party asserting that a patent claim is anticipated under 35 U.S.C. § 102 must demonstrate, among other things, identity of invention." *Minnesota Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1565 (Fed.Cir.1992) (internal citations and quotations omitted). Identity of invention is a question of fact, and one who seeks such finding must show, by clear and convincing evidence, "that each element of the claim in issue is found, either expressly or under principles of inherency, in a single prior art reference, or that the claimed invention was previously known or embodied in a single prior art device or practice." *Id.* Thus, "the exclusion of a claimed element from a prior art reference is enough to negate anticipation by that reference." *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1574 (Fed. Cir.1984).

■ Preliminary to this analysis is the interpretation of a patent's claims, which is a matter of law for the court. *See SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1118 (Fed.Cir.1985) (in banc). "A claim is construed in the light of the claim language, the other claims, the prior art, [and] the prosecution history...." *Id.* Claim interpretation "is not, however, to be confused with reading into a claim a limitation appearing in the specification but not in the claim." *Minnesota Mining*, 976 F.2d at 1566. This is so because it is the patent's claims, and not the specification, which define the invention. *See id.*

■ Further, the law of anticipation requires that a distinction be drawn between the invention described or "taught" and the invention claimed. As the Federal Circuit Court of Appeals has stated:

> The law of anticipation does not require that the [prior art] reference "teach" what the subject patent teaches. Assuming that a reference is properly "prior art," *it is only necessary that the claims under attack, as construed by the court, "read on" something disclosed in the reference, i.e., all limitations of the claim are found in the reference, or "fully met" by it.*

*Kalman v. Kimberly–Clark Corp.*, 713 F.2d 760, 772 (Fed.Cir.1983) (emphasis added), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984), *overruled on other grounds, SRI Int'l v. Matsushita Elec. Corp.*,

775 F.2d 1107, 1125 (Fed.Cir.1985) (in banc) (overruling *Kalman* on issue of whether non-infringement under the reverse doctrine of equivalents is a legal question).

In addition, "when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement." *SRI Int'l,* 775 F.2d at 1122.

Turning to the instant case, the claims chart set forth in Finding of Fact ¶ 82 compares claims 1, 3, 5, and 9–14 of the '128 patent with the teachings of Manby.[10] The left column contains a verbatim copy of these claims divided by section. The right column shows the Court's findings as to the corresponding elements within Manby, and provides citations to the text or figures where a description of structural and functional interconnections for the corresponding elements can be found. The claims chart reflects the Court's determination that the defendants have succeeded in proving, by clear and convincing evidence, that Manby either expressly, or inherently, discloses and thereby anticipates each and every element of claims 1, 3, 5, and 9–14. *See supra* Findings of Fact ¶ 82.

In the Court's view, the closest question with respect to anticipation arises in regard to the issue of whether the "contact points" teaching of Manby anticipates the "center lines" limitation of the '128 patent. Because the defendants do not argue that the '128 patent is invalid on the basis of obviousness under 35 U.S.C. § 103, the Court's analysis is restricted to the issue of anticipation under 35 U.S.C. § 102. This, in turn, necessitates further consideration of the principle of inherency and the extent to which, for purposes of § 102, the two inventions would be regarded as the same by persons of ordinary skill in the field of the invention.

In order for a patent to be rendered invalid on the basis of anticipation, "[t]here must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps Clinic & Research Foundation v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed.Cir.1991). "When more than one reference is required to establish unpatentability of the claimed invention, anticipation under § 102 can not be found, and validity is determined in terms of § 103." *Continental Can Co. USA, Inc. v. Monsanto Co.,* 948 F.2d 1264, 1267 (Fed.Cir.1991); *see Scripps Clinic,* 927 F.2d at 1577 ("If it is necessary to reach beyond the boundaries of a single reference to provide missing disclosure of the claimed invention, the proper ground is not § 102 anticipation, but § 103 obviousness.").

"To serve as an anticipation when the reference is silent about the asserted inherent characteristic, such gap in the reference may be filled with recourse to extrinsic evidence. Such evidence must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill" in the field of the invention. *Continental Can Co.,* 948 F.2d at 1268; *see In re Paulsen,* 30 F.3d 1475, 1479–80 (Fed.Cir.1994).

> Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient. *If, however, the disclosure is sufficient to show that the natural result flowing from the operation as taught would result in the performance of the questioned function, it seems to be well settled that the disclosure should be regarded as sufficient.*

*Continental Can Co.,* 948 F.2d at 1269 (quoting *In re Oelrich,* 666 F.2d 578, 581 (C.C.P.A.

---

10. As previously discussed, plaintiff has withdrawn all charges and issues with respect to claims 2, 4 and 6–8 of the '128 patent, *see supra* Findings of Fact ¶ 8, and moreover does not argue in his Proposed Findings of Fact and Conclusions of Law that any of these claims were not disclosed in the Manby patent. Instead, plaintiff specifically asserts that the Manby patent makes no disclosure about the two pathways of one closed loop path being relatively spaced from each other a distance greater than the width of the bearing lands, and that the method of measuring the distance between the pathways in the '128 patent cannot be found in the Manby patent. *See* Pl.'s Proposed Findings of Fact and Conclusions of Law, at 37.

1981)); *see In re Okui,* No. 94–1434, 91 F.3d 169, 1996 WL 297599, at *1 (Fed.Cir. June 5, 1996); *Glaxo, Inc. v. Novopharm Ltd.,* 52 F.3d 1043, 1047 (Fed.Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 516, 133 L.Ed.2d 424 (1995).

Turning to the case at bar, for the reasons stated in the Court's Findings of Fact, the Court holds that the defendants have proven by clear and convincing evidence that the center lines limitation of the '128 patent is properly regarded as a "natural result flowing from the operation" of the "contact points" element as taught by Manby. *Continental Can Co.,* 948 F.2d at 1268. Indeed, the Court finds—even without reliance upon extrinsic evidence—that the limitation of employing a center line between the pathway legs of the closed loops "is necessarily present" in Manby and that it would be so recognized by persons of ordinary skill in the field of the invention. *Id.* at 1268; *see In re Paulsen,* 30 F.3d at 1479–80.

In sum, the Court finds that LRB has succeeded in rebutting the presumption of patent validity by clear and convincing evidence. Accordingly, the Court holds that all of the claims in question of the Geffner '128 patent are anticipated by the prior Manby patent and therefore are invalid.

## IV. Geffner's Asserted Inequitable Conduct Before the PTO

The defendants next contend that separate and apart from the asserted invalidity of the subject patent, the claims of the '128 patent are unenforceable as a result of Geffner's inequitable conduct before the PTO.

■■■■ "Applicants for patents are required to conduct themselves with candor in their dealings with the PTO. Thus, if an applicant withholds material information from the PTO with intent to affect the allowance of claims, the applicant may be found guilty of inequitable conduct and the patent obtained would be rendered unenforceable." [11] *LaBounty Mfg. v. U.S. Int'l Trade Comm'n,* 958 F.2d 1066, 1070 (Fed.Cir.1992);

*see Hycor Corp. v. Schlueter Co.,* 740 F.2d 1529, 1538 (Fed.Cir.1984).

■■■■ The doctrine of inequitable conduct requires a court to undertake a three-step analysis. First, the court must discern whether the withheld references satisfy a threshold level of materiality. The second inquiry requires the court to determine whether the applicant's conduct establishes a threshold showing of intent to mislead the examiner. *See Heidelberger Druckmaschinen AG v. Hantscho Comm. Prods.,* 21 F.3d 1068, 1073 (Fed.Cir.1994); *Halliburton Co. v. Schlumberger Technology Corp.,* 925 F.2d 1435, 1439 (Fed.Cir.1991). "The elements of materiality of withheld information and culpable intent must be established by clear and convincing evidence." *LaBounty Mfg.,* 958 F.2d at 1070. Assuming that these threshold requirements have been established, the patentee's materiality and intent must be considered together to determine if there was inequitable conduct. Where the information misrepresented has a lower degree of materiality, a higher degree of intent is required for a finding of inequitable conduct and vice versa. *See American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1362–63 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

The threshold degree of materiality of the undisclosed, misleading or inaccurate information can be established by any of four tests: (1) the objective "but for" test; (2) the subjective "but for" test; (3) the "but it may have been" test; and (4) 37 C.F.R. § 1.56(a). *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.,* 750 F.2d 1569, 1578 (Fed.Cir.1984). The last of these tests, which is the one most frequently employed, *see American Hoist,* 725 F.2d at 1363, considers whether "there is a substantial likelihood that a reasonable examiner would consider [the omitted, false or misleading information] important in deciding whether to allow the application to issue as a patent." 37 C.F.R. § 1.56(a) (1984).

---

11. "[P]roving inequitable conduct does not 'invalidate' a patent. Rather, it renders the patent unenforceable." *Minnesota Mining and Mfg. Co.*

*v. Johnson & Johnson Orthopaedics, Inc.,* 976 F.2d 1559, 1569 (Fed.Cir.1992).

Certain governing principles apply to each of the above tests of materiality. First, "a patentee has no obligation to disclose an otherwise material reference if the reference is cumulative or less material than those already before the examiner." *Halliburton Co.,* 925 F.2d at 1440; *see Litton Indus. Prods. v. Solid State Systems Corp.,* 755 F.2d 158, 167 (Fed.Cir.1985). In addition, little weight generally should be attached to a European examiner's rejection of a patent because "the theories and laws of patentability vary from country to country, as do examination practices." *Heidelberger,* 21 F.3d at 1072 n. 2.

The threshold showing of intent may be satisfied by any of the following categories of mental culpability: (1) a deliberate intent to deceive; (2) recklessness; or (3) gross negligence. *See American Hoist,* 725 F.2d at 1363; *Austin Powder Co. v. Atlas Powder Co.,* 593 F.Supp. 208, 212 (D.Del.1984). A deliberate intent to deceive need not be proven by direct evidence. Rather, it can be "proven by 'a showing of acts the natural consequences of which are presumably intended by the actor.'" *Merck & Co. v. Danbury Pharmacal, Inc.,* 873 F.2d 1418, 1422 (Fed.Cir.1989) (quoting *Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1151 (Fed.Cir.1983)).

Assuming that the threshold requirements of materiality and intent have been established by clear and convincing evidence, a court next must carefully balance "intent in light of materiality." *Hycor Corp.,* 740 F.2d at 1539. In this connection, the Federal Circuit Court of Appeals has explained:

> Questions of "materiality" and "culpability" are often interrelated and intertwined, so that a lesser showing of the materiality of the withheld information may suffice when an intentional scheme to defraud is established, whereas a greater showing of the materiality of withheld information would necessarily create an inference that its non-disclosure was "wrongful."

*American Hoist,* 725 F.2d at 1363.

Applying these standards to the case at bar, for the reasons stated in the Court's Findings of Fact, the Court concludes that the defendants have established by clear and convincing evidence the threshold requirements of materiality and intent in connection with Geffner's conduct before the PTO, and that a balancing of these factors warrants a determination of inequitable conduct.

The Court finds the level of materiality attributable to Geffner's inaccurate depictions of Manby to be extremely high, approaching the point of being decisive to the Examiner's decision whether to allow his patent to issue. At the very least, defendants have proven by clear and convincing evidence that the inaccurately depicted and misleading information was of such significance to create a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. *See American Hoist,* 725 F.2d at 1363; 37 C.F.R. § 1.56(a) (1984). Indeed, Geffner's misrepresentations in seeking to distinguish his invention from Manby went to the heart of that inquiry.[12]

Further, as indicated in the Court's Findings of Fact, Geffner's misleading depictions of Manby were not made innocently. Rather, this Court finds Geffner's misleading depictions of Manby to have been done intentionally with the conscious objective of misleading the Examiner in his comparative analysis of the critical elements of the Manby patent.

Finally, upon balancing these elements of a high level of materiality with a deliberate intent to deceive, it is clear that Geffner's actions before the PTO fall within the classic paradigm of inequitable conduct. Simply stated, absent Geffner's knowingly misleading depictions of Manby, Geffner probably would have been unable to distinguish his invention from Manby. Accordingly, the claims of the '128 patent are unenforceable as a result of his inequitable conduct before the PTO.

## V. LRB's Cross–Claim to Rescind the Patent Agreement and to Obtain Restitution

Defendant LRB has cross-claimed to rescind the license agreement that it entered

---

**12.** The Court notes that the PTO had a copy of the Manby patent in its possession.

into with plaintiff Geffner on August 3, 1977. As previously discussed, the license agreement (the "Patent Agreement") granted Linear Rotary, Inc. (the predecessor entity to LRB) an exclusive license to make, use and sell bearings according to Geffner's '128 patent and required Linear Rotary, Inc. to pay Geffner substantial royalties. *See supra* Findings of Fact — 25. The Patent Agreement was executed a little more than two months after the Geffner '128 patent was issued. In support of its position, LRB contends that Geffner fraudulently induced it to enter into the Patent Agreement, in breach of his fiduciary duties as an officer and director of LRB, by failing to disclose material information concerning the significance of the Manby patent. As its remedies, LRB seeks rescission of the Patent Agreement, and restitution of all royalties paid under the Patent Agreement and the legal fees that it incurred on plaintiff's behalf for the prosecution and maintenance of plaintiff's foreign patents.

The rights of the parties in connection with their obligations under a patent agreement are determined by state law. *See Sun Studs, Inc. v. ATA Equip. Leasing, Inc.,* 872 F.2d 978, 992 (Fed.Cir.1989), *overruled on other grounds, A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1038–39 (Fed.Cir.1992) (overruling *Sun Studs* concerning defendant's burden of persuasion on affirmative defense of laches). In the case at bar, the Patent Agreement stipulates that New York law is to govern the agreement's construction. *See* Pl.'s Ex. 2, at 8. In addition, because LRB is incorporated under the laws of the State of New York, New York corporate law governs the obligations of fiduciaries in engaging in transactions with their corporations.

As a preliminary matter, plaintiff Geffner asserts that he is insulated from liability in respect of the Patent Agreement as a result of the inclusion of a provision therein whereby he disclaims any representation or warranty of the validity of his patent. *See* Pl.'s Ex. 2, at 2–3. Plaintiff's argument fails, however, because it is well established that "parties cannot use contractual limitation of liability clauses to shield themselves from liability for their own fraudulent conduct." *Turkish v. Kasenetz,* 27 F.3d 23, 27–28 (2d Cir.1994). In this regard, a "false representation may take the form of silence where there is a duty to speak." *United States ex rel. Roman v. Schlesinger,* 404 F.Supp. 77, 85 (E.D.N.Y.1975). As the Court now turns to discuss, such a duty to speak was imposed upon Geffner under New York law as a result of his status as a corporate fiduciary who was engaging in a self-interested transaction.

The behavior of a fiduciary is marked by "the duty of the finest loyalty." *Meinhard v. Salmon,* 249 N.Y. 458, 463–64, 164 N.E. 545 (1928) (Cardozo, J.). As Judge Cardozo explained:

> Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.

*Id.* at 464, 164 N.E. 545. This standard of conduct applies equally to corporate fiduciaries, and moreover places the burden of proving the fairness of the transaction upon the corporate fiduciary. Thus, under New York law, "a contract between a corporation and [a director] may be set aside unless the proponent of the contract 'shall establish affirmatively that the contract or transaction was fair and reasonable as to the corporation at the time it was approved by the board' [of directors]." *Lewis v. S.L. & E., Inc.,* 629 F.2d 764, 769 (2d Cir.1980) (quoting N.Y.Bus. Corp.Law § 713(b)). Indeed, "courts are unlikely to uphold a self-interested transaction if there has not been full disclosure concerning the transaction. . . ." William L. Cary & Melvin A. Eisenberg, Cases and Materials on Corporations 602 (6th ed. 1988) [hereinafter Cary & Eisenberg].

As addressed at length in the Court's Findings of Fact, the Court is of the view that Geffner fraudulently induced LRB to enter into the Patent Agreement, in breach of his fiduciary duty of loyalty as an officer and director of LRB, as a result of his

knowingly deceptive failure to disclose material information to the other directors concerning the significance of the Manby patent and his misleading conduct before the PTO.[13] *See supra* Findings of Fact ¶¶ 138–144. Accordingly, the Patent Agreement is subject to rescission.

 Restitution is the appropriate remedy for a corporate fiduciary's breach of his duty of loyalty for engaging in an act of self dealing. *See* Cary & Eisenberg, *supra*, at 571. Pursuant to this remedy, a director who has engaged in a self-interested transaction must "return [the] gain to which he was not entitled in the first place." *Id.* at 572; *see, e.g., Lewis*, 629 F.2d at 773 (directors held liable for sum equal to the amount by which the annual fair rental value of property exceeded the rent that was charged to their controlled entity). Defendant LRB therefore is entitled to restitution of $527,531, said amount representing the sum of the $477,032 in royalties that LRB paid to Geffner and the $50,499 in legal fees that LRB expended on Geffner's behalf for the prosecution and maintenance of his foreign patents.[14] *See supra* Findings of Fact ¶ 42.[15]

## VI. Defendant LRB's Application for Attorney Fees

Finally, defendant LRB requests an award of costs, attorney fees and expenses under 35 U.S.C. § 285 on the ground that this is an exceptional case.

 A "court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. The burden is on the party moving for attorney fees "to prove the exceptional nature of the case

by clear and convincing evidence." *Carroll Touch, Inc. v. Electro Mechanical Systems, Inc.*, 15 F.3d 1573, 1584 (Fed.Cir.1993). A finding of an exceptional case may be justified, in the discretion of the district court, *see Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1384 (Fed.Cir. 1983), "where a patentee has litigated in bad faith, or committed fraud or other inequitable conduct during prosecution before the Patent and Trademark Office." *Machinery Corp. v. Gullfiber AB*, 774 F.2d 467, 472 (Fed.Cir. 1985); *see Buildex Inc. v. Kason Indus.*, 849 F.2d 1461, 1466 (Fed.Cir.1988) (Conduct in the procurement of a patent is relevant to the question whether a case is "exceptional," so as to justify an award of attorney fees under 35 U.S.C. § 285.). In addition, "[i]n order ... to recover attorney fees, there must be proof of actual wrongful intent ... or of gross negligence." *Machinery Corp.*, 774 F.2d at 473.

 Upon careful consideration of the entire record, the Court finds that defendant LRB has proven the exceptional nature of this case by clear and convincing evidence so as to warrant an award of attorney fees under 35 U.S.C. § 285. Specifically, this Court has determined that Geffner's actions before the PTO involved a high level of materiality coupled with a deliberate intent to deceive, and thus made out a clear-cut case of inequitable conduct. Indeed, this Court has determined that, absent Geffner's knowingly misleading depictions of Manby, Geffner, in all likelihood, would have been unable to distinguish his invention from Manby. Accordingly, the Court regards these circumstances to be exceptional and to militate in

13. For completeness of record, the Court expressly holds that LRB has proven Geffner's fraudulent conduct and breach of fiduciary duty by clear and convincing evidence.

14. In its Proposed Conclusions of Law, LRB relies upon *Transitron Electronic Corp. v. Hughes Aircraft Co.*, 649 F.2d 871, 876 (1st Cir.1981), for the proposition that if the licensee can establish that the patent licensor knowingly committed fraud during the licensing transaction, the court may require a return of all royalties paid. For completeness of record, the Court expressly holds that LRB has proven by clear and convinc-

ing evidence that such circumstances have been established. The Court observes, however, that the analysis set forth in *Transitron* is somewhat at odds with the position of the Federal Circuit Court of Appeals that state law (as opposed to federal common law) properly governs the determination of the rights and remedies of parties in respect of a patent licensing agreement. *See Sun Studs*, 872 F.2d at 992.

15. The Court finds no basis in equity for plaintiff to assert laches or unclean hands to prevent the restitution of the benefits conferred upon Geffner as a result of the Patent Agreement.

favor of an award of attorney fees.[16]

### CONCLUSION

In accordance with the foregoing, the Court enters the following orders in this action:

1. Plaintiff's motion to add the counterclaim defense of assignee estoppel is DENIED.

2. The Court holds that the claims in question of the '128 patent (i.e., claims 1, 3, 5 and 9–14) are invalid and unenforceable in view of the prior art disclosures of Manby under 35 U.S.C. § 102 and plaintiff's inequitable conduct before the PTO during the prosecution of the '128 patent.

3. The Court holds that the patent license agreement at issue is subject to rescission as a result of Geffner's breach of his fiduciary duty of loyalty to LRB through his failure to disclose to LRB's other directors various critical issues relating to the possible invalidity or unenforceability of the '128 patent. Accordingly, the patent agreement at issue having been rescinded, defendant LRB is entitled to restitution in the amount of $527,-531.

4. Plaintiff's Complaint is dismissed with prejudice in its entirety.

5. Because the Court finds this to be an exceptional case, defendant LRB is entitled to reimbursement of its costs, attorney fees and expenses under 35 U.S.C. § 285.

6. Defendant LRB's application for attorney fees shall be filed and briefed by the parties in accordance with the Court's individual rules governing civil motion practice.

SO ORDERED.

---

**16.** For completeness of record, the Court notes that its determination—that Geffner's inequitable conduct before the PTO renders this an exceptional case—would not be altered even if the center lines limitation of the '128 patent did not read on the prior Manby reference.